795 A.2d 876

WALTER DAS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF EMMANUEL ANDREWS DAS, AND AS ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF EMMANUEL ANDREWS DAS, AND REGI ANDREWS DAS, H/W, PLAINTIFFS–APPELLANTS, v. SURESH R. THANI, M.D., DEFENDANT–RESPONDENT, AND JAMES L. KUSNIERZ, M.D., JOHN DOE, M.D., A FICTITIOUS PERSON, AND JANE DOE, A FICTITIOUS PERSON, DEFENDANTS.

Argued February 11, 2002—Decided May 8, 2002.

*Donna L. Freidel* argued the cause for appellants.

*Judith A. Wahrenberger* argued the cause for respondent (*Wahrenberger & O'Brien,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

This is an obstetrical medical malpractice case in which the defendant treating physician relies on the medical judgment rule. Defendant Dr. Suresh R. Thani chose to assess fetal movement by asking the mother-to-be to count the number of times she felt the fetus kick, a technique referred to as maternal fetal monitoring, rather than by using modern ultrasound, electronic fetal monitoring and biophysical profile methods that were available in his office. Based on expert testimony for the defense that it was a question of medical judgment which technology to use, the trial court submitted the case to the jury with a medical judgment

charge. The jury exonerated defendant of all liability. The Appellate Division affirmed.

The critical issue raised in this appeal is whether the trial court was obligated to instruct the jury that the medical judgment defense was unavailable to defendant if it accepted plaintiff's theory that it was a deviation from the accepted standard of care for defendant not to have used the more modern fetal monitoring technique. We hold that such an instruction was required because a finding of deviation by the jury removes from the case the factual underpinning required to support a medical judgment defense. Failure to give that instruction in this case constitutes reversible error.

I.

Defendant Dr. Suresh R. Thani is a specialist in obstetrics and gynecology. Plaintiff Regi Das became defendant's patient in the spring of 1994 when she was pregnant with her first child. On September 9, 1994, defendant advised plaintiff that her blood sugar was high and that she might be diabetic. Defendant did not, however, confirm whether plaintiff had diabetes until October 5, when he prescribed insulin for the first time.

On November 19, in the thirty-ninth week of pregnancy, plaintiff called defendant because she had not been experiencing any fetal movements. Defendant was off duty, but another physician covering for him advised plaintiff to go to the hospital. Doctors at the hospital performed an ultrasound, electronic fetal monitoring and a biophysical profile. Those tests revealed there was fetal movement, but the fetal heart rate was abnormal and the amniotic fluid volume was low, indicating that the fetus was not receiving enough oxygen. The physicians explained to plaintiff that the condition of the fetus had developed over a prolonged period of time and that labor should be induced immediately. Plaintiff accepted that advice and delivered a son by Caesarian section. The child required immediate resuscitation and died four days later.

Throughout plaintiff's pregnancy, defendant did not use equipment that was in his office to perform ultrasound examinations, fetal monitoring or biophysical profiles to monitor the health and development of the fetus. Instead, he used maternal fetal monitoring, a technique that requires a mother to tell the doctor how often the fetus has moved during a two-hour period. In addition, to monitor fetal growth and determine whether the fetus was either abnormally small or large, defendant would place his fingers on plaintiff's abdomen and count the number of fingertips from top to bottom to determine the length of the fetus.

Plaintiff's theory of liability at trial was that defendant's failure to use more modern methods to monitor the fetus resulted in the premature birth and death of the baby. To support that theory, plaintiff presented an expert who described defendant's method of treating plaintiff as "1960's medicine." According to that expert, defendant should have used the more accurate and standard methods of ultrasound examinations, electronic fetal monitoring and biophysical profiles when defendant started prescribing insulin during the thirty-second week of the pregnancy. That expert asserted that those tests should be performed prior to fetal maturity in cases of gestational diabetes because insulin-dependent diabetics are at risk of fetal death in the third trimester. The testing, therefore, was necessary to determine whether the pregnancy should be terminated prematurely by either inducing labor or performing a Caesarian section in order to prevent the death of the fetus.

Plaintiff's expert also testified that each of the monitoring procedures that defendant should have used had been available for many years prior to plaintiff's pregnancy. With regard to electronic fetal monitoring, the expert testified that it became available to obstetrics and gynecology practitioners in the early 1970's and is performed by placing an electronic device on the mother's chest and abdomen to assess the fetal activity and fetal heart rate. With regard to ultrasounds, the expert testified that "in the early '80's and certainly into the '90's, ultrasounds took on a much more

active role ... in making sure that the infant's condition was good enough that delivering was not apt to be affected by premature diabetes." Lastly, with regard to biophysical profiles, which incorporate both the electronic fetal monitoring and ultrasound evaluation, the expert testified that they were used for high-risk patients and allow physicians to "look at the amniotic fluid, continue with the biophysical monitoring, the so-called non-stress test, [and] come up with a score." The score determines whether the fetus needs to be delivered right away. It was the opinion of plaintiff's expert that defendant breached the standard of care by not performing any of those tests. Plaintiff's expert concluded that if such tests had been performed, physicians could have prevented the death of the baby. The physician who delivered the baby corroborated that conclusion in finding that the baby's condition had deteriorated over a prolonged period and was not a recent condition.

Defendant's expert acknowledged that the techniques referred to by plaintiff's expert had been in use for fifteen years, but opined that maternal fetal monitoring, which defendant used, complied with the standard of care. Defendant's expert testified that, for purposes of fetal surveillance, physicians can "have the patient count fetal movements" or "monitor [the] fetus by ultrasound ... [or] biophysical testing. There's a whole array of ways you can monitor a fetus." Defendant's expert also testified that, for purposes of fetal surveillance in cases of diabetes, the same methods are available and that using any or all of them would have complied with the standard of care in 1994 when plaintiff's baby was born.

With regard to the gestational diabetes, the defense expert was asked: "Is it your opinion that as soon as insulin was initiated in the treatment of gestational diabetes that the standard requires that an ultrasound, biophysical profile, non-stress testing be initiated?" He responded:

Well, again, when we talk of fetal testing ... they're all in one package with the fetal movement and I think we discussed that about when you might institute that. Now ultrasound for the sheer measurement of the fetus, well, you need an

indication for that. So if you had a very high blood glucose levels or you suspected the fetus was large, you will do an ultrasound for evaluation of fetus size.... The other value is if you suspect that the fetus was undergrown and was getting into trouble because it was undergrown.

Defendant's explanation for not using the more accurate tests, which his office was equipped to perform, was simply that it was for "medical reasons" without further explanation. On cross-examination, however, defendant stated that he had not performed those tests because there had been no indications of any problems with the fetus prior to delivery. Defendant clarified that if there were medical reasons for not performing those tests, those reasons would have been noted in his records.

The trial court submitted the case to the jury with a medical judgment charge. The jury returned a verdict for defendant. In denying plaintiff's motion for a new trial, the court reasoned that "[a]s in many of these malpractice cases, this was a battle of the experts. The experts gave two different opinions based on the same facts, and the jury chose to believe the defense expert."

On appeal, plaintiff argued that, although there was a battle between experts, the ultimate verdict was caused by the trial court's failure to tailor the medical judgment charge to the facts of the case, thereby allowing the jury to excuse defendant's negligence as medical judgment. The Appellate Division affirmed, but this Court granted certification, 165 N.J. 674, 762 A.2d 655 (2000), and remanded the case to the Appellate Division for reconsideration in light of our decision in *Velazquez v. Portadin*, 163 N.J. 677, 751 A.2d 102 (2000), which was rendered subsequent to the trial in this matter. On remand, the Appellate Division, although acknowledging that the trial court had failed to tailor the jury instructions to the facts and legal theories, nonetheless reaffirmed its prior decision. We again granted certification, 170 N.J. 387, 788 A.2d 771 (2001), and now reverse.

## II.

Plaintiff argues that the trial court failed to tailor the medical judgment charge to the facts of the case and that that

error impermissibly allowed the jury to excuse defendant's deviation from the standard of care as medical judgment when no judgment was exercised. Plaintiff also contends that the trial court erred by not instructing the jury that if it found there was a deviation from the appropriate standard of care, then the medical judgment rule has no application. Because plaintiff did not object to the jury charge at the time of trial, any error in the jury instructions is reviewable only as plain error. *R.* 2:10–2.

The trial court gave the following relevant jury charge:

Negligence is conduct which falls below a standard of care required by law for the protection of persons and property from foreseeable risks of harm. Negligence may result from the performance of an act or the failure to act. The determination of whether a defendant was negligent requires a comparison of a defendant's conduct whether that was the performance of an act or the failure to act against the standard of accepted conduct.

If the defendant's conduct is found to have fallen below an accepted standard of care, it is said that he or she is negligent. Therefore, to decide the case properly, you must know the standard of care imposed by all up against which the defendant's conduct as a physician is to be measured.

Now the defendant, in this case, is a specialist in the field of Obstetrics and Gynecology. Specialists in a given field of medicine represent that they will have and employ not merely the knowledge and skill of the general practitioner, but that they will have and will employ knowledge and skill normally possessed and used by the average specialist in the field.

Thus, when a physician holds himself out as a specialist and undertakes to diagnose and treat the medical needs of a patient, the law imposes a duty on that physician to have and use that degree of knowledge and skill which is normally possessed and used by specialists in the field—having regard to the state [of] scientific knowledge at the time that he attended the plaintiff.

In view of what I have just said, it becomes important for you to know the standard of care which a specialist in Obstetrics and Gynecology is required to observe in the treatment of his patient under the circumstances of this case.

Based upon common knowledge alone and without technical training, jurors normally cannot know what conduct constitutes the standard medical practice. Therefore, the standard of practice by which a physician's conduct is to be judged, must be furnished by expert testimony. That is to say, by the testimony of persons who by knowledge, training, experience are deemed qualified to testify and to express their opinions on those subjects.

You as jurors should not speculate or guess about the standard by which the defendant physician should have conducted himself in the diagnosis and treatment of plaintiff. Now you must determine the applicable medical standard from the testimony of the expert witnesses that you have heard in this case.

Where there is a conflict in the testimony of the medical experts on the subject as there is in this case, it is for you, the jury, to resolve that conflict and you use the same guidelines in determining credibility that I just mentioned earlier.

You are not required to accept arbitrarily the opinions offered. You should consider the expert's qualifications, training, experience, as well as his understanding of the matters to which he testified. Where an expert has offered an opinion upon an assumption that certain facts are true, it is for you, the jury, to decide whether the facts upon which the opinion is based are, in fact, true.

The value and weight of an expert's testimony in such instances are dependent upon and most [sic] stronger than the facts upon which it is predicated. After deciding what the standard medical practice is in the circumstances of this case, you must then determine whether the defendant physician has conformed with or deviated from the standard of care.

In examining the conduct of the defendant physician to determine whether there was a deviation from an accepted standard of care, that is where he was negligent, you should understand that the law recognizes that the practice of medicine is not an exact science. Unfortunately, even when a doctor acts properly in accordance with accepted medical standards, the patient still may not be cured and a poor, unanticipated result may occur.

Accordingly, you may not find Dr. Thani negligent merely because you find that his patient has had a poor or [unanticipated] result. The defendant, Dr. Thani, may be found negligent only if he failed to follow accepted medical standards when diagnosing and treating his patient. In diagnosing and treating a patient, a doctor must exercise his judgment in accordance with accepted medical standards.

*Doctors must make their diagnosis and select treatment options from the body of scientific and medical information available at the time. However, in such a situation, the doctor can exercise in his judgment in diagnosing and treating a patient is still [sic] required to use the degree of skill and knowledge normally possessed and used by the average specialist in the field.*

The doctors should not act mechanically, but should take into account all relevant medical facts pertaining to the patient. He may not do something which standard medical practice prohibits or fail to do something that requires [sic] in this situation. *When the accepted standards of medical practice permit two or more courses of action and the physician in the exercise of his judgment selects one of those alternatives, he cannot be found negligent if the course chosen produces a poor result.*

However, if the doctor, in exercising his judgment, does something which standard medical practice forbids or fails to do something the standard medical practice requires, the doctor is negligent. Similarly, if the doctor, in exercising his judgment, fails to do something which is required by standard medical practice, then he is also negligent. I've just repeated myself.

In summary, if you find the defendant has complied with the accepted standard of medical care then he is not liable to the plaintiff regardless of the result. On the other hand, if you find the defendant has departed from the accepted medical standard, then you must determine whether such deviation or negligence was a proximate cause of any injury sustained or any loss incurred by plaintiff.

██ It is axiomatic that clear and correct jury charges are essential to a fair trial, and the failure to provide them may constitute plain error. *State v. Robinson*, 165 *N.J.* 32, 40, 754 *A.*2d 1153 (2000). "A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations. . . . [T]he court must explain the controlling legal principles and the questions the jury is to decide." *State v. Martin*, 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990). Therefore, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." *State v. Afanador*, 151 *N.J.* 41, 54, 697 *A.*2d 529 (1997).

The charge given here closely mirrors the Model Jury Charge for medical malpractice. *See Model Jury Charges (Civil)*, § 5.36A Medical Malpractice, Duty and Negligence (Feb. 2001). The Model Jury Charge instructs the jury that a physician must exercise the standard of care appropriate to the average member of the profession practicing in that field. *See Walck v. Johns Manville Prods. Corp.*, 56 *N.J.* 533, 560, 267 *A.*2d 508 (1970); *Schueler v. Strelinger*, 43 *N.J.* 330, 344, 204 *A.*2d 577 (1964). The model charge further instructs the jurors that they must rely on expert testimony and "not speculate or guess" about the standard of care applicable to the diagnosis and treatment at issue in the case. See *Walck, supra*, 56 *N.J.* at 562, 267 *A.*2d 508; *Schueler, supra*, 43 *N.J.* at 345, 204 *A.*2d 577.

██ After giving the charge relating to the standard of care, a trial court must decide whether to instruct the jury that defendant's actions may constitute an exercise of medical judgment that would excuse that defendant from liability for a poor result. *Aiello v. Muhlenberg Reg'l Med. Ctr.*, 159 *N.J.* 618, 632, 733 *A.*2d 433 (1999). To constitute a medical judgment, a medical decision generally must involve "misdiagnosis or the selection of one of two or more generally accepted courses of treatment." *Velazquez, supra*, 163 *N.J.* at 687, 751 *A.*2d 102; *Aiello, supra*, 159 *N.J.* at 628–29, 733 *A.*2d 433. In the latter category, which is involved in the present case, the course of treatment followed

must be an "equally acceptable approach" in order not to be considered a deviation from the appropriate standard of care. *Velazquez, supra,* 163 *N.J.* at 690, 751 *A.*2d 102. Otherwise, "[i]f the exercise of judgment rule is inappropriately or erroneously applied in a case that involves only the exercise of reasonable care, the aspect of the rule that excuses a physician for 'mistakes' would enable the physician to avoid responsibility for ordinary negligence." *Aiello, supra,* 159 *N.J.* at 632, 733 *A.*2d 433.

Therefore, to avoid jury confusion, we recently held that the "[c]ourt and counsel should analyze the parties' testimony and theories in detail, on the record, to determine whether the [medical judgment] charge is applicable at all and, if so, to which specific issues. The charge should then be tailored accordingly." *Velazquez, supra,* 163 *N.J.* at 690, 751 *A.*2d 102. Following *Velazquez* and subsequent to the trial in this case, the Model Jury Charge relating to medical judgment was revised to state:

> A doctor may have to exercise judgment when diagnosing and treating a patient. However, alternative diagnosis/treatment choices must be in accordance with accepted standard medical practice. Therefore, your focus should be on whether standard medical practice allowed judgment to be exercised as to diagnosis and treatment alternatives and, if so, whether what the doctor actually did to diagnose or treat this patient was accepted as standard medical practice. If you determine that the standard of care for treatment or diagnosis with respect to [specify what type(s) treatment or diagnosis is involved] did not allow for the choices or judgments the defendant doctor made here, then the doctor would be negligent.
>
> [*Model Jury Charges (Civil),* § 5.36G Medical Malpractice, Medical Judgment (Feb. 2001).]

That revised model jury charge reflects the mandate in *Velazquez* that a medical judgment charge that does not specify what action may qualify as an appropriate exercise of judgment may result in an overly broad charge that has "the potential to improperly insulate defendants from liability." *Velazquez, supra,* 163 *N.J.* at 690–91, 751 *A.*2d 102.

■ Like *Velazquez,* the trial court here failed to tailor the jury charge to the theories and facts presented in the case. Thus, the risk that was present in *Velazquez* is present here. Defense counsel, "knowing the power of the judgment charge, took every

opportunity to lead the court and jury into thinking that the entire case revolved around the exercise of judgment." *Id.* at 690, 751 *A*.2d 102. Just as the failure to specify what actions may constitute a proper exercise of medical judgment was reversible error in *Velazquez*, it is reversible error here.

In this case, the jury first should have been instructed that if it believed plaintiff's expert that defendant deviated from the standard of care by not monitoring plaintiff's pregnancy with ultrasounds, electronic fetal monitoring and biophysical profiles, then it may not excuse defendant's omissions as medical judgment. Conversely, if it believed defendant's expert that maternal fetal monitoring complied with the standard of care, then the selection of one of two generally accepted courses of treatment was an exercise of medical judgment for which defendant could not be liable. Stated differently, the jury should have been instructed that in order for defendant to prevail based on the exercise of medical judgment, the jury had to find that maternal fetal monitoring represented an equally acceptable approach to the other, more modern alternatives. The jury instructions must incorporate the evidence and the legal theories of liability and make clear that medical "judgment does not represent a departure from the requirements of accepted medical practice." *Schueler, supra,* 43 *N.J.* at 345, 204 *A*.2d 577. That is the only way to make clear to a jury what action may qualify as an acceptable exercise of medical judgment.

Because the jury was not properly instructed regarding medical judgment based on the evidence and legal theories presented, the jury was free to excuse defendant's actions by using a lesser standard, such as by finding that defendant's omissions constituted a "good faith" or "bona fide" judgment. See *Morlino v. Med. Ctr. of Ocean County,* 152 *N.J.* 563, 585, 706 *A*.2d 721 (1998). The instructions did not make clear to the jury that "[t]he selection of an alternative that is objectively unreasonable would violate the doctor's duty of care to the patient." *Id.* at 584, 706 *A*.2d 721. In exercising medical judgment, doctors must act "with due regard

for the individual needs of each patient" and consider the patient's physical and mental condition "[i]n making diagnoses and selecting among treatment options." *Ibid.*

Here, plaintiff was a first-time expectant mother with gestational diabetes. Defendant was an experienced physician who had modern equipment in his office that would have enabled him to comply with the standard of care described by plaintiff's expert. Although the jury was entitled to believe defendant's expert's testimony that using the modern equipment was not required by the appropriate standard of care, the jury was not given a road map on how to make that determination. The jury was not properly instructed that it could do so only if the decision not to use the modern equipment represented an equally acceptable and objectively reasonable determination based on plaintiff's medical condition. That shortcoming created a substantial likelihood of improperly insulating defendant from liability.

■ The Appellate Division found that, although "the trial court did not precisely tailor the jury charge to the respective claims of the parties and the evidence, there was no error because the issue was sharply focused. Counsel for both sides made their respective position clear to the jury." We reject that conclusion. Regardless of how clearly trial counsel may have articulated their arguments to the jury, the ultimate responsibility rests with the court to instruct the jury regarding the appropriate law that is applicable to the evidence. *Robinson, supra,* 165 *N.J.* at 42, 754 *A.*2d 1153. The medical judgment charge here was not inaccurate; it was grossly inadequate when viewed in the context of the evidence presented and the claims made by plaintiff. Because the inadequate jury instructions had the tendency to confuse or mislead the jury, we find plain error that was clearly capable of producing an unjust result. See *Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 409, 678 *A.*2d 1060 (1996).

### III.

We reverse the judgment of the Appellate Division and remand to the Law Division for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.