45 A.3d 986 (2012)
426 N.J. Super. 449
John FILGUEIRAS, Plaintiff-Respondent/Cross-Appellant,
v.
NEWARK PUBLIC SCHOOLS, Roberto Clemente Elementary School, Calvin J. Mott, and Luis J. Lopez, Defendants-Appellants, Cross-Respondents.
A-0241-10T1
Superior Court of New Jersey, Appellate Division.
Argued February 7, 2012.
Decided June 18, 2012.
*988 Sandro Polledri argued the cause for appellants/cross-respondents (Adams, Stern, Gutierrez & Lattiboudere, LLC, attorneys; Mr. Polledri, of counsel and on the brief; Alexander L. D'Jamoos, Newark, on the brief).
Fred Shahrooz Scampato, Westfield, argued the cause for respondent/cross-appellant (Law Office of Fred Shahrooz Scampato, attorneys; Mr. Scampato, of counsel and on the brief; David Rostan, Morris Plains, on the brief).
Before Judges MESSANO, YANNOTTI and KENNEDY.
The opinion of the court was delivered by MESSANO, P.J.A.D.
Plaintiff John Filgueiras began his employment as a gym teacher at defendant Roberto Clemente Elementary School (the School), operated by defendant Newark Public Schools (NPS), in September 2005. Defendant Luis M. Lopez was the School's principal, and defendant Calvin J. Mott was one of the School's vice-principals. Plaintiff's employment was terminated on December 27, 2006.
In a complaint filed on January 4, 2008, plaintiff alleged that defendants: violated his due process and equal protection rights under the New Jersey Constitution and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (the CRA) (count I); retaliated against him in violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14 (CEPA) (count II); breached the implied covenant of good faith and fair dealing (count III); defamed him (Count IV); intentionally inflicted emotional distress upon him (Count V); placed him before the public in a false light (Count VI); and otherwise committed acts constituting invasion of privacy (Count VII). Defendants answered denying the allegations.
Defendants' pre-trial summary judgment motion was denied by one Law Division judge and the case proceeded to trial before a different judge. After plaintiff rested, defendants moved for an involuntary dismissal pursuant to Rule 4:37-2(b). The judge denied the motion.
After all the evidence was admitted, defendants moved for judgment pursuant to Rule 4:40-1. The judge dismissed: 1) all claims against Lopez; 2) the CEPA claim *989 against Mott; and 3) the breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress claims against all defendants (counts III and V). Plaintiff voluntarily dismissed his equal protection and invasion of privacy claims (part of count I and count VII).
Regarding plaintiff's alleged CRA due process violation, the judge granted the motion and dismissed plaintiff's claim that his procedural due process rights had been violated. However, the judge denied the motion as to plaintiff's claim of a substantive due process violation.
The jury returned verdicts of no cause of action on counts II, IV, and VI (CEPA, defamation, and false light). As to plaintiff's claim of a substantive due process violation under the CRA, the jury awarded him $23,534.50 in economic damages and $5000 in emotional distress damages. Defendants' motion for judgment notwithstanding the verdict (JNOV) pursuant to Rule 4:40-2(b) was denied.
The judge awarded plaintiff $143,894.12 in counsel fees and costs which was less than plaintiff sought. The judge thereafter entered a final amended judgment in the total amount of $175,286.75 that included $31,392.63 in damages and pre-judgment interest. This appeal followed.
Defendants contend plaintiff's substantive due process claim under the CRA should have been dismissed because: 1) "the substantive due process clause does not apply to personnel decisions of a public employer"; and 2) the judge "allow[ed] plaintiff to create a substantive due process claim from everyday workplace disagreements." Defendants also argue that the due process claim should have been dismissed because of CEPA's waiver provision. See N.J.S.A. 34:19-8 (providing that institution of an action under CEPA "shall be deemed a waiver of the rights and remedies available under ... State law, rule or regulation or under the common law"). Defendants further contend that the trial judge erred by denying their motion for JNOV because the evidence did not support a finding that defendants' "actions were so egregious, malicious and abusive that they shocked the conscience or offended human dignity." Lastly, defendants contend they were entitled to immunity. Plaintiff counters these arguments and cross-appeals from the judge's fee award, contending that he "erred by reducing the lodestar by [fifty] percent."
We have considered these arguments in light of the record and applicable legal standards. We conclude that plaintiff's substantive due process cause of action under the CRA should have been dismissed by the trial judge at the conclusion of plaintiff's case. R. 4:37-2(b). We therefore reverse, dismiss plaintiff's cross-appeal and remand the matter to the trial court for the entry of judgment in favor of defendants.

I.
Motions for involuntary dismissal, Rule 4:37-2(b), judgment, Rule 4:40-1, and JNOV, Rule 4:40-2, are governed by the same evidential standard:
[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied....
[Verdicchio v. Ricca, 179 N.J. 1, 30, 843 A.2d 1042 (2004) (citations omitted).]
See also Pressler & Verniero, Current N.J. Court Rules, comment 1 on R. 4:40 (2012). We apply the same standard of review, Estate of Roach v. TRW, Inc., 164 N.J. *990 598, 612, 754 A.2d 544 (2000), "accept[ing] as true all the evidence supporting [plaintiff] and accord him all legitimate inferences." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 441, 867 A.2d 1133 (2005). Because we conclude defendants' motion to dismiss made at the end of plaintiff's case should have been granted, we confine our review solely to the evidence presented on his case in chief. See Verdicchio, supra, 179 N.J. at 30-31 n. 4, 843 A.2d 1042.
We recite much of the evidence regarding events that preceded plaintiff's actual termination. Of themselves, these events did not form the basis of plaintiff's substantive due process claim. We include them because plaintiff contends they evidence defendants' motive and animus toward him.

Plaintiff's Hiring and First Year at the School
In 2002, plaintiff, who had been a personal trainer, operated a gym, and worked as a loan officer and security guard since graduating from college in 1976, returned to school to become a physical education teacher under the alternate route program (the program). The program permitted those who did not have an undergraduate degree in education to receive on-the-job training and become certified by the State Department of Education (DOE).
The program was divided into three phases that were documented in guidelines NPS furnished to plaintiff before he commenced work. Plaintiff was to receive twenty days of mentorship with an experienced teacher who, to the extent possible, taught in the same subject area, followed by ten weeks of supervision, including biweekly evaluations and five months of support and supervision including evaluation for at least four teaching periods. NPS's policy regarding the mentoring of teachers in the program required that a new teacher be placed in a mentor teacher's classroom, or vice versa, with the district hiring an appropriate substitute as necessary.
In September 2005, NPS hired plaintiff and assigned him to the School, which included students between pre-kindergarten and fourth grade. The employment contract for the 2005-06 school year specified that plaintiff was an at-will employee who could be terminated upon thirty days' notice.
Plaintiff began working on September 15, 2005 under the direct supervision of Mott. Deborah Moustakas was also a vice-principal at the school. Within days, plaintiff complained to Mott and Moustakas that he was not supplied with a mentor, and they told him "they were working on it." Plaintiff taught his classes without a mentor for two weeks, and testified that he "didn't know what [he] was doing," "the kids weren't learning anything," and he was "watching them have playground time." Plaintiff was assigned to observe some experienced physical education teachers at other elementary schools where he "learned some basic skills." Mott and Lopez, however, did not want to incur the expense of paying for a substitute in plaintiff's absence.
In early October, Mott told plaintiff that Giuseppe Leone would be his mentor. Leone, NPS's technology coordinator, had gone through the program himself but had no prior experience as a physical education teacher, spent little time with plaintiff and provided no real guidance. Leone testified he met with plaintiff only two or three times, after which Leone learned, from both Mott and plaintiff, that plaintiff "did not want [Leone's] services because" "a computer guy ... would not be able to assist him."
Plaintiff's experience was in contrast to that of Marijoe Ashikwei, who also went through the program and began teaching *991 second-grade at the School at the same time as plaintiff. Ashikwei testified that she formed a close relationship with her mentor teacher, for whom she worked previously as a teacher's aide. Ashikwei stated that Mott helped her whenever she asked, although she could not recall how frequently she sought his assistance.
During September and October 2005, plaintiff complained to Mott about physical conditions in the gym. He also complained to Moustakas about the lack of guidance he was receiving in learning how to curb his students' unruly behavior, the fact that his students did not have sneakers and Leone's inadequate mentoring. Moustakas did not address his concerns.
On October 19, Lopez sent plaintiff a memorandum entitled "Teacher Responsibilities," in which he criticized plaintiff for being "unaware" that two students had left the gym with "scooters" and for failing to have lesson plans for a substitute teacher. Lopez ordered plaintiff to submit "substitute plans" to him.
Plaintiff testified that he allowed the students to take the scooters home because they were otherwise broken and about to be discarded. He also claimed that Leone told him he need not prepare substitute lesson plans because he was a gym teacher.
In mid-November, Mott informed plaintiff that he was required to submit lesson plans. Mott spoke with plaintiff a few times to assist him in preparing lesson plans and advised plaintiff to contact physical education teachers from other schools for assistance.
On December 21, 2005, plaintiff received a "letter of discipline" from Mott stating that he had failed to submit lesson plans in a timely fashion. Plaintiff explained in a letter dated December 30, that Mott had not provided him with a specific date for submission of the lesson plans, and plaintiff had submitted the plans per Mott's request the following day. Also on December 30, plaintiff wrote to his union representative that he had received "no on the job support or mentor" since September, had been "criticized by the administration regarding many different aspects of the job for which [he] ha[d] not been properly trained," and requested "an experienced teacher or mentor" for guidance.
In January 2006, several experienced physical education teachers from other schools came to the School and observed plaintiff. In a memorandum dated January 27, Lopez told plaintiff that his "[twenty] day mentoring program [would] begin on January 29" with Victor DeSalvo, an experienced physical education teacher at another school. Plaintiff stated that DeSalvo "was very good" and "taught [plaintiff] what [he] needed to know."
On January 10, Mott evaluated plaintiff's performance. Of four possible grades  unsatisfactory, basic, proficient, and distinguished  plaintiff's overall rating was "basic." Plaintiff received a similar overall rating from Mott in a second evaluation dated March 30 and a third evaluation in June. Mott recommended plaintiff for continued employment.
However, in the interim, by memorandum dated March 16, Lopez notified plaintiff that "[s]everal parents" had complained about his inappropriate use of profanity during class. Plaintiff admitted that he had, on one occasion, told his students that "they're acting like a bunch of stupid asses."
Plaintiff also testified regarding an incident that occurred in June 2006 involving one of his students, Y.R. Plaintiff instructed the girl to sit on the floor, but she refused and sat on a bench. Plaintiff "lightly held her by her upper arm and ... positioned her from the bench until she sat *992 on the floor." Y.R. was not hurt, and plaintiff did not send her to the school nurse to be seen for any injury.
Plaintiff testified that the Division of Youth and Family Services (DYFS) investigated the incident and issued a report that "came back unfounded." Months later, he confirmed with Marie Alum, the nurse at the School, that she never examined Y.R., although DYFS's report of the incident "said [Y.R.] was ... looked at by the school nurse." Alum testified that although her duties included investigating claims of physical abuse made by students, and reporting same to DYFS, she did not recall examining Y.R. or making such a report.
Plaintiff was not disciplined, and, on June 8, a second employment contract for the 2006-2007 school year was executed. The terms of the contract again provided that plaintiff was an at-will employee subject to termination upon thirty-days' written notice. Mott approved plaintiff for a standard certification in health and physical education, and the DOE issued him a teaching certificate.

Plaintiff's Second Year at the School
On September 7, 2006, the first day of the new school year, Mott gave plaintiff a letter which summarized "strategies" discussed at a meeting held two days earlier. Plaintiff was to: "[r]efrain from any and all physical contact with students"; complete appropriate lesson plans and use them on a daily basis; visit all students in their classrooms prior to the first day of physical activity to "inform [them] of ... gym procedures"; prohibit students from drinking water during class; begin instruction immediately upon students' arrival; watch students at all times; limit the number of simultaneous activities; and prohibit the use of scooters.
Plaintiff testified that physical contact with the students was unavoidable. He complained to Mott and Moustakas that denying his students water during gym was hazardous to their health. Indeed, DeSalvo testified that he permitted his students to drink water "one at a time" during the rest period at the end of gym class. Plaintiff's complaints to Mott and Moustakas were rebuffed.
Mott evaluated plaintiff for the first time in the new school year on October 11, 2006. Plaintiff's overall rating was again "basic." When Mott reviewed the evaluation with him, plaintiff noted it contained several factual errors, for example, what games the students were playing during the observation period. Mott's reaction to plaintiff's comments was "hostile," causing plaintiff to become "very suspicious of ... Mott because [he] had trouble with him the year before." Plaintiff refused to sign the evaluation until Mott corrected it.
Plaintiff did not see Mott again until November 21. On that day, Mott came to plaintiff's gym class and told him to report to the main office. When he arrived, plaintiff saw two envelopes for him sitting on a bench. One contained a memo from Mott, dated November 16, 2006, entitled "INAPPROPRIATE DISCIPLINE (alleged)." We quote from it at length:
On Wednesday, November 15, ... several boys ... informed me of an incident that took place in the gymnasium during one of their physical education classes. Those students ... indicated that in your efforts to discipline [them], you allegedly demanded that the boys fight like animals and kill each other in your make shift cage .... When [two of the boys] fell out of the cage during the rumble, you at least one time, physically grabbed the boys and tossed them back into the homemade cage. The same students say that you commented more *993 than once throughout the ordeal that they can go ahead and kill themselves. Many students from the class support the boys' claims.
Your actions as expressed by the three victims and one witness, is [sic] unequivocally unacceptable and completely opposes all codes of conduct ... as well as, federal and state statutes and regulations....
[I]t is critical that you use better judgment in resolving problems within the gymnasium. You have been reminded in written form and orally that the administration is always ready to assist. Please allow us to.
The second envelope contained a letter from Lopez, dated November 20, detailing a complaint he received from the parent of a female student, K.L., "alleg[ing] that her daughter informed her that [plaintiff had] touched her daughter inappropriately several times." Lopez "called [the student] to [his] office and in the presence of the other two administrators[,] she corroborated the same information." Lopez stated "this type of behavior will not be tolerated in this school and must cease immediately." Both documents ordered plaintiff to attend a meeting with Lopez and Mott on November 21.
After reading the memo and the letter, plaintiff believed "they seemed serious" and left before the meeting began to "speak to [his] union representative." Lopez sent plaintiff a memo, dated November 21, noting his absence from the scheduled meeting and advising him to "adhere to the following recommendations: 1. Refrain from the use of profanity directed toward students. 2. Discontinue physically touching students. 3. Cease kicking students to get their attention." Lopez further advised that he had "received numerous complaints from students, parents and colleagues regarding [plaintiff's] poor and inappropriate style of classroom management[,]" and, if "these complaints continue[d] [his] only alternative ... [would] be to report this to the proper authority."
At trial, plaintiff was asked if he recalled the incident described in Mott's memo. He testified that on October 19, three boys came into class "pushing and shoving," and plaintiff "blew [his] whistle and ... [told the] boys [they were] ... fighting like animals and ... [they were] going to kill each other." He brought the boys to the corner of the gym near a "foldout table." Plaintiff thought the boys were going to "dive underneath [the] table," so he "moved the table and it tipped over." Plaintiff "picked [the table] up and slid it against the wall," and the "boys sat there.... Nobody was tossed. Nobody was touched. Nobody was injured." Regarding the allegations in Lopez's letter, plaintiff testified he had a vague recollection of the female student involved and denied touching any student "inappropriately or especially in an inappropriate body part."
On November 27, Moustakas told plaintiff he was reassigned to another school. On November 30, John Scott-Bey, NPS's Chief Investigator, interviewed plaintiff regarding the inappropriate touching allegations made by K.L. At trial, plaintiff was permitted to testify about his conversations with Scott-Bey and the results of the investigation, which were contained in a report Scott-Bey prepared that was admitted into evidence. The report noted that after investigation, DYFS concluded the October 2005 referral involving Y.R. was "unfounded," and that the Division's investigation of "the second allegation will be unfounded also." Scott-Bey recommended that plaintiff be transferred to a high school.
On December 7, plaintiff was notified in writing by Laurette Asante, NPS's Director *994 of "Labor/Employee Relations," that a meeting was to be held on December 12 regarding allegations "that [he] allegedly engaged in inappropriate discipline of [his] students during gym class." Plaintiff went to the meeting with Pietro Petino, his union representative. The focus was the "cage incident," and Mott presented the alleged facts to Asante, including four written statements taken from the young boys involved. Plaintiff believed they "were manipulated by Mr. Mott to write such a thing...." Petino spoke on plaintiff's behalf and denied the allegations.
While testifying at trial, plaintiff identified a Staff Incident Report dated November 27 prepared by Mott for Lopez. The report indicated that on November 15, the four boys told Mott about "an incident that took place in the gymnasium ... in the month of October." The report further contained details of the allegations similar to those Mott wrote in his November 16 memo to plaintiff.
On December 27, plaintiff received a termination letter from NPS's Executive Director, Rita R. Salley. It provided, "[b]ased upon appropriate recommendations from administrative staff, the district is exercising its right under ... [your] employment contract ... and terminating your services as a Physical Education Teacher, effective immediately."
Plaintiff testified he was quite surprised, since NPS's "Child Abuse and Neglect Policy" provided:
Due process rights will be provided to school personnel or volunteers who have been reassigned or suspended as a result of an accusation of child abuse or neglect. Temporary reassignment or suspension of school personnel or volunteers alleged to have committed an act of child abuse or neglect shall occur if there is reasonable cause to believe that the life or health of the alleged victim or other children is in imminent danger due to continued contact between the school personnel and a child.
All references to a report of child abuse or neglect against school personnel shall be removed from employee personnel records immediately following the receipt of an official notice from DYFS that such allegations were unfounded.
Plaintiff continued to receive his salary until January 26, 2007.

Events after Plaintiff was Terminated
At trial, plaintiff introduced two letters he wrote to Scott-Bey and Marion Bolden, the NPS Superintendent, in January 2007, essentially recounting his version of events. Plaintiff testified that he "was doing everything ... trying to speak to everyone that [he] could to try to get [his] job back, and try to get that transfer." The letter to Scott-Bey referenced a conversation plaintiff claimed to have had on January 25, 2007, in which Scott-Bey told him "they were still working ... on the transfer."
Plaintiff's request for unemployment benefits was denied by the Department of Labor because he was discharged for alleged improper conduct. Mott's version of the "cage incident" was apparently the basis for this conclusion. Plaintiff successfully appealed and began receiving unemployment benefits in May.
Plaintiff testified regarding the physical and psychological effects his termination had upon him. Dr. Stephen Kopel, a clinical psychologist, testified that plaintiff suffered from clinical depression and post-traumatic stress disorder as a result of the events. Plaintiff re-enrolled in school and obtained a certificate in health education. However, his efforts to find employment, demonstrated by dozens of faxes he sent to various school districts commencing in *995 January 2008, were unsuccessful until September 2008, when he was hired by the Irvington School District as a physical education teacher.
In January and June 2007, plaintiff received letters from the Institutional Abuse Investigation Unit (IAIU) of the New Jersey Department of Children and Families (DCF) which investigated referrals regarding the inappropriate touching of K.L. and the "cage incident."[1] The January letter, authored by investigator Ongeri Aminga regarding the K.L. incident, noted "[s]exual [a]buse was unfounded," and the investigation "revealed no sexual/genital contact occurred." However, Aminga referenced "issues noted in the course of the investigation," including K.L.'s claim that plaintiff "was wont of putting his arms around her waist," and that plaintiff was "fond of yelling and kicking students by their feet." Aminga concluded plaintiff's actions did not place K.L. "at any risk of harm and were not to the degree required by statute to find sexual abuse." At trial, plaintiff testified that contact with the children was unavoidable, and that he observed Mott and Lopez touch students on occasion.
The July letter, from investigator Tomieka Cherry, determined the referral regarding the "cage incident" was "unfounded." However, Cherry noted concern that plaintiff had "arranged an area for the students to engage in a physical altercation and then allowed it to occur," and had "verbally threatened the students during th[e] incident." Cherry concluded that "[t]he actions of [plaintiff] placed the students at some risk of harm but were not to the degree required by statute to find physical abuse."
Cherry testified before the jury and described the steps she took in investigating the "cage incident," including interviews of plaintiff, Mott, another teacher, the students and some parents. The male students substantially corroborated Mott's version of events, although there were inconsistencies between their statements and those of the female students who witnessed the incident. Cherry testified that Mott said the "cage incident" occurred on October 2, 2006, and she also noted that Mott did not make the report to DYFS until December 5, nearly two months later.
Plaintiff retained a private investigator, Louis F. Stephens, "to check on [his] job reference to see what the ... School would say about [him], why [he] was terminated." Representing themselves as employers seeking references on plaintiff, Stephens and a member of his staff taped phone conversations with Mott and Moustakas.
Mott indicated to Stephens he would "love to say something and give an opinion about [plaintiff]" but could not because plaintiff was suing the school system. In fact, plaintiff's complaint was not filed until after the conversation. Moustakas told Stephens she was not "at liberty to discuss [plaintiff's] situation," but indicated she "did not have a problem with [plaintiff]." Moustakas told Stephens she knew "there was a DYFS situation," but could provide no information. In the conversation with Stephens's associate, Mott said he "would rather not give out any information in regards to [plaintiff]," and "would have to talk with legal" before commenting. Mott continued, however, by saying plaintiff had been "released." When asked if the release was for "administrative purposes," Mott replied:
That is the part that gets ... real touchy. There was a situation that we had to address and after addressing this *996 situation several times[,] a determination was made by our legal department.
Asked if he would recommend plaintiff, Mott answered:
No. I would not like to be unfair. I have my own personal opinion[,] but I would think that if you can determine I am sure you would come up with the right conclusion considering that we are at a school that cares for young ones and we are at a school where children should be the priority, and whether they should be safe and sound at all times. And our highest interest and regard are for our young citizens. So I think you can be able to determine something from that.
After plaintiff rested, defendants moved for involuntary dismissal. Regarding the CRA claim, defense counsel focused on plaintiff's allegation that defendants fabricated the abuse complaints referred to DYFS that led to his termination. Defense counsel argued that "under [§] 1983 law, ... before you can bring a procedur[al] due process claim, assuming that's what's being brought here, you have to essentially exhaust your administrative remedies." Defendants also argued that plaintiff's property rights were limited to the contract.
Citing an earlier ruling made by the judge when defendants moved for summary judgment, plaintiff argued that it was "law of the case that there was no need to exhaust administrative remedies in a New Jersey civil rights matter." Plaintiff further contended, as he did at the time the motion for summary judgment was denied, that the NPS child abuse policy and N.J.S.A. 18A:6-7(a) "conferred due process rights upon [him]."[2]
In denying defendants' motion in this regard, the judge concluded the statute and policy "could create a property interest in employment which could be actionable here in this case.... [T]here is a legitimate argument that under the ... policy the plaintiff shouldn't have been terminated but could have been reassigned or suspended until the DYFS investigation came back. And that there were ... potentially references to reports that should not have been referred to."
Although it was not expressed at this time, we glean some of the judge's additional reasoning from his oral decision denying defendants' post-trial JNOV motion.
[T]his just wasn't an employment rights case. It was about the right to liberty, reputation, pursuit of happiness and to avoid a stigma. It occurred through the plaintiff's employment, but why this court submitted the substantive due process is that even though it arose out of the defendant's employment, it had an effect upon his reputation through the rest of his life.
. . . .
Now, I also put weight in Doe v. P[o]rtiz, [142 N.J. 1, 662 A.2d 367 (1995) ]. And that says you only need a *997 reputation to be at stake as a protectable interest in New Jersey.
. . . .
I think it is a fundamental right of every citizen in this [S]tate, even if they're a[ ][non]-tenured teacher, to have their reputation protected. [In re Allegations of Sexual Abuse at] East Park High School, [314 N.J.Super. 149, 714 A.2d 339 (App.Div.1998) ], which this court reviewed again and cited, ... along with Doe in my making all my pretrial and trial rulings[,] [t]alked about the stigma of a reputational injury, and the state impairment of future employment being a liberty interest.
. . . .
[S]omeone accused of abuse or touching of a  especially little children  and when there were so many discrepancies, the termination supported the allegations and hurt and stigmatized the plaintiff.
Not waiting for DYFS, even though legally the defendants could have done so, comments made at the school  to plaintiff's investigator.... The [D]epartment of [L]abor alleged comments. Those would all go to liberty reputation.

II.
The CRA was modeled after the federal Civil Rights Act of 1871, 42 U.S.C.A. § 1983. Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J.Super. 103, 115, 30 A.3d 1061 (App.Div.), certif. denied, 208 N.J. 366, 29 A.3d 739 (2011); Trafton v. City of Woodbury, 799 F.Supp.2d 417, 443 (D.N.J.2011). N.J.S.A. 10:6-2(c) provides in relevant part:
Any person who has been deprived of any substantive due process ... rights, privileges or immunities secured by the Constitution or laws of the United States, or ... of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
The elements of a substantive due process claim under the CRA are the same as those under § 1983. Rezem Family Assocs., LP, supra, 423 N.J.Super. at 115, 30 A.3d 1061; see also Trafton, supra, 799 F.Supp.2d at 443 (noting the federal district court in New Jersey "has repeatedly interpreted [the CRA] analogously to § 1983").
To establish a § 1983 claim, "the first task ... is to identify the state actor, `the person acting under color of law,' that has caused the alleged deprivation." Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 363, 671 A.2d 567 (citing Monell v. City Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 636 (1978)), cert. denied, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). "The second task is to identify a `right, privilege or immunity' secured to the claimant by the Constitution or other federal laws of the United States." Ibid. (quoting 42 U.S.C.A. § 1983). Thus, Section 1983 "`is not itself a source of substantive rights,' but merely provides `a method [for] vindicating federal rights elsewhere conferred....'" Ibid. (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433, 442 n. 3 (1979)).
"The principle of substantive due process, founded in the federal Constitution, U.S. Const. amend. XIV, § 1, and our State Constitution, N.J. Const. art. I, § 1, protects individuals from the `arbitrary exercise of the powers of government' and `governmental power [... ] being used for *998 [the] purposes of oppression.'" Felicioni v. Admin. Office of the Courts, 404 N.J.Super. 382, 392, 961 A.2d 1207 (App.Div.2008) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986)), certif. denied, 203 N.J. 440, 3 A.3d 1228 (2010). "However, the constitutional guarantee `does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law.'" Ibid. (quoting Rivkin, supra, 143 N.J. at 366, 671 A.2d 567). "[S]ubstantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that `shock the conscience or otherwise offend ... judicial notions of fairness ... [and that are] offensive to human dignity.'" Ibid. (second alteration in original) (quoting Rivkin, supra, 143 N.J. at 366, 671 A.2d 567). Accord Chainey v. Street, 523 F.3d 200, 219 (3d Cir.2008) ("To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience.").
Defendants contend that plaintiff's substantive due process claim failed because a non-tenured teacher does not possess a sufficient property interest to trigger constitutional protection. We agree.
"[A]n employee hired at will has no protected interest in his employment and may not prevail on a claim that his or her discharge constituted a violation of property rights." Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J.Super. 337, 355, 633 A.2d 985 (App.Div.1993) (citing Bd. of Regents v. Roth, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972)), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994). In Nicholas v. Pa. State Univ., 227 F.3d 133, 142 (3d Cir.2000), the court went further by concluding that "tenured public employment is [not] a fundamental property interest entitled to substantive due process protection."
Here, plaintiff was a non-tenured teacher employed pursuant to a contract that permitted NPS to terminate him upon thirty-days' written notice. Plaintiff was terminated and paid an additional thirty days of salary, i.e., all he was entitled to receive under the contract. He had no property right to continued employment.
Plaintiff argued in opposition to defendants' summary judgment motion, and again when defendants moved for involuntary dismissal, that violations of NPS's child abuse and neglect policy, and N.J.S.A. 18A:6-7(a), somehow made his substantive due process claim cognizable under the CRA. However, plaintiff has now conceded in his brief and during oral argument before us that any violations of the school district's policy or N.J.S.A. 18A:6-7(a) are not the bases of his substantive due process claim. We need not address the issue further.[3]
Instead, plaintiff argues that the evidence was sufficient to prove a substantive due process violation of his liberty interests, specifically, his right to be free from the "promulgati[on] of falsehoods to harm the reputation and dignity of a citizen of *999 the [S]tate." Plaintiff advanced such an argument in opposition to defendants' summary judgment and involuntary dismissal motions, and defense counsel touched upon that theme in summation.
However, the issue was never submitted to the jury. The judge specifically charged the jury:
Count one; plaintiff alleges a violation of the [CRA]. Specifically the plaintiff claims that the defendant[s] unlawfully violated his civil rights by terminating his employment in violation of a state statute and [NPS's] [p]olicy regarding abuse and neglect that afforded plaintiff certain substantive due process rights.
The judge then proceeded to tell the jury that it "must determine whether defendants acted properly in conducting [their] investigation in this case, or whether [their] conduct was so egregious and abusive that [it] shocks the conscience, violates the civilized norms of government or offend[s] human dignity." The judge continued, "[Y]ou must first decide did the defendant terminate plaintiff's employment in violation of the State's statute and [NPS's] policy on child abuse and neglect...." The verdict sheet asked the jury to decide whether NPS violated its policy or N.J.S.A. 18A:6-7(a), and whether the violation "deprived plaintiff of his substantive due process rights secured by state or constitutional law?" The jury was never asked to consider a substantive due process claim alleging violation of plaintiff's liberty interests.
Since the jury was never charged on this theory of liability under the CRA, the verdict that resulted in plaintiff's favor simply cannot stand, and, at the least, reversal would be required and a new trial ordered. See, e.g., Das v. Thani, 171 N.J. 518, 527, 795 A.2d 876 (2002). However, we are convinced that the evidence, viewed in a light most favorable to plaintiff, failed to prove a substantive due process violation of plaintiff's liberty interests.
"As a general matter, one does not have a federal constitutionally protected liberty interest in his reputation." Austin v. Neal, 933 F.Supp. 444, 455 (E.D.Pa.1996) (citation omitted). To assert a cognizable due process claim under § 1983, "a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3rd Cir.2006) (citing Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160-61, 47 L.Ed.2d 405, 414 (1976)). "In the public employment context, the `stigma-plus' test has been applied to mean that when an employer `creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." Ibid. (quoting Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92, 97 (1977)). "[A] public employee who is defamed in the course of being terminated or constructively discharged satisfies the `stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost." Id. at 238.
The Third Circuit, however, has repeatedly held that even if the liberty interest meets the "stigma-plus test," it is not accorded substantive due process protections. "To the extent [the plaintiff]'s substantive due process claim [under § 1983] was based not only on loss of his job, but also on reputational injury that decreased his ability to earn a living, it also fails." Hill, supra, 455 F.3d at 235 n. 12 (emphasis added). See also Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399-404 (3d Cir.) (holding that defamatory comments negatively affecting the plaintiff's business did not support a substantive due process claim), cert. denied, *1000 531 U.S. 1011, 121 S.Ct. 566, 148 L.Ed.2d 485 (2000). "Where one is defamed or stigmatized in the course of his dismissal from public employment, ... he does have a cognizable liberty interest[,]" but "[t]hat interest ... is not accorded substantive due process protection." Austin, supra, 933 F.Supp. at 455-56 (citations omitted). "Rather, the right accorded is that of procedural due process, specifically the right to an opportunity to refute the charges and clear one's name." Id. at 456. Thus, plaintiff's liberty claim was not cognizable as a substantive due process violation under § 1983.
Plaintiff argues that our state constitution affords more expansive substantive due process protections for reputational liberty interests. We consider the merits of that claim.
"Under Article I, Paragraph 1, as under the Fourteenth Amendment's substantive due process analysis, determining whether a fundamental right exists involves a two-step inquiry. First, the asserted fundamental liberty interest must be clearly identified. Second, that liberty interest must be objectively and deeply rooted in the traditions, history, and conscience of the people of this State." Lewis v. Harris, 188 N.J. 415, 435, 908 A.2d 196 (2006) (citation omitted) (citing King v. S. Jersey Nat'l Bank, 66 N.J. 161, 178, 330 A.2d 1 (1974)). Plaintiff points to no New Jersey precedent that has recognized a liberty interest in one's good reputation that is embodied in our state constitution and protected by substantive due process rights.
In considering a challenge to the law requiring community notification regarding certain sex offenders, the Court in Doe, supra, 142 N.J. at 99, 662 A.2d 367, clearly held that the case did not "deal ... with the question of substantive constitutional deprivation." The Court found "protectible interests in both privacy and reputation" that were more expansive than federal precedent by concluding that injury to reputation alone sufficed, i.e., that the stigma-plus test did not apply. Id. at 104, 662 A.2d 367. However, the Court noted that "[i]n fulfilling [our] responsibility [for interpreting the New Jersey Constitution], `we have generally been more willing to find State-created interests that invoke the protection of procedural due process than have our federal counterparts.'" Ibid. (quoting N.J. Parole Bd. v. Byrne, 93 N.J. 192, 208, 460 A.2d 103 (1983)) (emphasis added). The Court defined the scope of those protections: "Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner. The minimum requirements of due process, therefore, are notice and the opportunity to be heard." Id. at 106 (citations omitted).
Another case relied upon by plaintiff below and before us is East Park High School, supra, 314 N.J.Super. at 149, 714 A.2d 339. There, we held that if DYFS substantiates a child abuse charge against a teacher resulting in the inclusion of his name in the Central Registry, the teacher was entitled to an administrative hearing to contest the finding. Id. at 159-66, 714 A.2d 339. We recognized that "[t]he loss of [a teacher's] good reputation, when the Central Registry information is shared with even a few private citizens, will irrevocably injure [the teacher's] previous good name[,]" and "[a]ccording to [Doe, supra, 142 N.J. at 104-05, 662 A.2d 367], this injury ..., standing alone, is a protectible private interest under the New Jersey Constitution." Id. at 162-63, 662 A.2d 367. Our reference to Doe in East Park High School recognized a teacher's right to procedural due process in such circumstances. Cf. In re an Allegation of Physical Abuse Concerning L.R., 321 *1001 N.J.Super. 444, 460-61, 729 A.2d 463 (App. Div.1999) (distinguishing East Park High School and concluding that a teacher is not entitled to a hearing where DYFS determines child abuse allegations have not been substantiated but nonetheless expresses concerns about the teacher's conduct).
In short, the only precedent cited by plaintiff recognizes that one's right to be free of arbitrary and abusive governmental damage to his reputation under our state constitution is protected only by procedural due process guarantees. Plaintiff concedes he was provided with procedural due process during the December 12, 2006 hearing with Asante.
Plaintiff now seeks to have us recognize a liberty interest in one's reputation that is embedded in our constitution and subject to protection as a substantive due process right under the CRA. Under the facts of this case, that would require us to convert what was essentially a tort claim of defamation into something actionable under the CRA. The federal precedent under § 1983 has refused to do so under similar circumstances. See Shovlin v. Univ. of Med. & Dentistry, 50 F.Supp.2d 297, 317 (D.N.J.1998) (noting that "to recognize such a claim would be in conflict with the well-settled rule that the tort of defamation does not rise to the level of a deprivation actionable under § 1983").
It is inappropriate for us, as a court of intermediate jurisdiction, to recognize a cause of action, particularly one of constitutional dimension, heretofore never recognized under existing jurisprudence from our Supreme Court. See Riley v. Keenan, 406 N.J.Super. 281, 297, 967 A.2d 868 (App.Div.) (noting that an appellate court "should normally defer to the Supreme Court ... with respect to the creation of a new cause of action") (citing Tynan v. Curzi, 332 N.J.Super. 267, 277, 753 A.2d 187 (App.Div.2000)), certif. denied, 200 N.J. 207, 976 A.2d 384 (2009). We refuse to do so.
In sum, the evidence in this case viewed in a light most favorable to plaintiff, failed to establish a claim of substantive due process violations cognizable under the CRA. Therefore, defendants' motion for an involuntary dismissal made at the end of plaintiff's case should have been granted. We reverse the judgment under review and remand the matter to the trial court for the entry of judgment in favor of defendants dismissing plaintiff's complaint and vacating any award of counsel fees.
Reversed on appeal; plaintiff's cross-appeal is dismissed.
NOTES
[1] The copies of these letters contained in the joint appendix are addressed to NPS's Director of Student Information Services, Susan Kandell.
[2] N.J.S.A. 18A:6-7a provides:

When a complaint made against a school employee alleging child abuse or neglect is investigated by the Department of Children and Families, the department shall notify the school district and the employee of its findings. Upon receipt of a finding by the department that such a complaint is unfounded, the school district shall remove any references to the complaint and investigation by the department from the employee's personnel records. A complaint made against a school employee that has been classified as unfounded by the department shall not be used against the employee for any purpose relating to employment, including but not limited to, discipline, salary, promotion, transfer, demotion, retention or continuance of employment, termination of employment or any right or privilege relating to employment.
[3] We only note that the Court has recently said, "N.J.S.A. 18A:6-7(a) does not bar the later institution of disciplinary charges against a teacher where DCF has investigated and declared allegations of child abuse unfounded." In re Young, 202 N.J. 50, 54, 995 A.2d 826 (2010). Plaintiff was provided the procedural due process required under the NPS policy during the December 2006 meeting with Asante where he was given the opportunity to refute the allegations. Plaintiff did not allege that NPS failed to remove all references to the abuse allegations from his personnel file when the investigations were concluded.