**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1762-15T3

MARIANNE MURPHY,

    Plaintiff-Appellant,

v.

RAEANN MARTIN,

    Defendant-Respondent.

_____

Submitted March 13, 2017 — Decided April 3, 2017

Before Judges Sabatino, Haas and Currier.

On appeal from Superior Court of New Jersey,
Law Division, Monmouth County, Docket No.
L-0153-12.

Emolo & Collini, attorneys for appellant (John
C. Emolo, on the brief).

John C. Prindiville, attorney for respondent.

PER CURIAM

    This appeal arises from a jury's no-cause verdict on claims brought by plaintiff Marianne Murphy against defendant Raeann Martin stemming from a roadway encounter. As a result of that encounter, defendant allegedly injured plaintiff and damaged plaintiff's car.

Plaintiff sued defendant, claiming negligence, assault, and battery. Defendant admitted that her vehicle struck plaintiff's open car door while attempting to leave the scene, but asserted that her conduct was excusable in light of the volatile situation and plaintiff's allegedly threatening behavior.

By agreement of the parties, the trial was bifurcated as to liability and then, if necessary, a damages phase. The liability phase spanned three days and involved five witnesses.

The sole argument plaintiff raises on appeal is that the trial court erred and unduly prejudiced her in reading to the jury, over objection, the generally-disfavored model jury charge for a "sudden emergency." See Model Jury Charge (Civil), 5:10(g), "Sudden Emergency." We agree with plaintiff that, in the factual context of this case, the court issued this jury charge improvidently. We further agree that the charge had the clear capacity to skew the jurors' objective assessment of the evidence. Consequently, we reverse the judgment for defendant and remand for a new trial.

I.

The principal witnesses in this trial were plaintiff and defendant. Their testimony diverged considerably about exactly what occurred on the day of the incident.

Plaintiff's Version

According to plaintiff, on June 2, 2010, she planned to go to the beach in Sandy Hook. She drove her 2001 Chrysler Sebring convertible east on Route 36 towards Sandy Hook. She had no passengers in her car.

When plaintiff initially entered Route 36, she drove in the right lane, but "for whatever reason" moved "eventually" into the left lane. "Not very long" after changing to the left lane, plaintiff moved back to the right lane. Before doing so, plaintiff allegedly "checked all [her] mirrors," "checked that the lane next to [her] was clear," and "put [her] blinker on[.]" Plaintiff noticed a car in the right lane as she moved into that lane, but, by her own estimation, it was "about 10 car lengths back[.]"

According to plaintiff, after she moved into the right lane, defendant, who was driving a van, "came up behind [her] and started screaming and yelling and cursing and flailing her arms[.]" Plaintiff's convertible had the top and windows down. The windows in defendant's van were likewise down.

Plaintiff testified that defendant's hostile reaction to her lane change made her "[a]bsolutely scared out of [her] wits

terrified." According to plaintiff, defendant was throwing things[1] around in her vehicle and did not have her hands on the steering wheel. Defendant allegedly was also "punching" the roof of the car and the wheel. Plaintiff claimed this behavior continued through "several" traffic lights.

Plaintiff eventually stopped at a traffic light. According to plaintiff, the van then moved into the left lane and came up alongside the convertible. At that moment, there was one car behind plaintiff and two cars in front of her, causing her to be "boxed in."

According to plaintiff, she then called a friend of her family on her cell phone. The friend was a retired police officer who had served in another town for twenty-eight years. Plaintiff testified that, while she was on the call, defendant continued to scream at her. She contends it was loud enough so that the friend could hear through the phone what defendant was shouting.

Plaintiff then observed that defendant was "reaching over her passenger side," attempting to grab her. She saw that defendant had a Snapple bottle "raised by her left arm . . . as if one were going to pitch."

---

[1] It is unclear what "things" plaintiff was referring to, or if that description included the Snapple bottle that she alleges defendant later used to threaten her.

Plaintiff testified that she put her car in park because she was "afraid that [she] was going to roll into the car in front of [her] and have an accident." By plaintiff's estimate, her car was "a foot and a half" from defendant's lane at the time.

At this point, plaintiff recalled, defendant's van "backed up and [then] rammed" into her convertible. According to plaintiff, the van hit the convertible three times. The impact allegedly "ripped" off her car door, leaving it "hanging by one hinge." She added that, when the van hit the back of the convertible, it caused the latter's door to "pop" open.

Plaintiff testified that after defendant's van struck her car, her friend told her to hang up and call 9-1-1, which she claims to have done.[2] She stated that defendant, by that point, had proceeded through the traffic light. Plaintiff estimated that defendant's van was "about 30 feet away" from her own car on the shoulder of the road.

Plaintiff admitted possessing in her car what she described as a "trinket" bat, which was next to her by the console. She explained that she kept that small bat in her car for protection, after her dog had been attacked by other dogs several months

---

[2] Plaintiff testified that she made several attempts to get a copy of the audio recording of the 9-1-1 call, but was unable to obtain one.

earlier. According to plaintiff, the bat was eight to ten inches long, and was similar to, but "a little thicker" than, a pen. Plaintiff contended that the bat the defense introduced into evidence at trial was inauthentic, and was not the actual one she had kept in her car.[3]

Plaintiff claimed that there were as many as eight eyewitnesses to the incident. However, she asserted that the police officers who responded to the scene did not take down the eyewitnesses' information, nor would they "allow" plaintiff to do so. One of the officers allegedly "intimidate[ed]" the eyewitnesses "with his ticket book" and told them to leave.[4]

The officers provided plaintiff with a form on which she could write a statement about the incident. According to plaintiff, she did not fill out the form that day because she was "shaking," "in pain," "confused," "in shock," and "hurt."

Plaintiff testified that the officers told defendant, with whom they appeared to be "familiar[,]" to leave, but conversely

_____

[3] The bat moved in evidence had a tag, indicating it had been logged at the Hazlet police station on August 1, 2011, almost a year and two months after the accident.

[4] Plaintiff filed an internal affairs complaint with the police in June 2010 because she claimed she was "unfairly treated" by the officers at the scene. However, her complaint was dismissed when she failed to appear for an interview. Plaintiff explained that she was in the hospital when the police department scheduled the interview, and was thus unavailable.

told plaintiff to stay. Plaintiff was issued a summons for wielding a weapon, after a police officer found the miniature bat in her car. That summons was eventually dismissed.

Plaintiff wrote a statement two days after the incident, and allegedly attempted to file it with the police multiple times. However, according to plaintiff, she was not allowed to file the statement until June 21, 2010, because up until that day the police report was not done and allegedly "they had nothing to put [her statement] with."

Plaintiff's friend also submitted a statement to the police soon after the incident, detailing what he had heard during his phone call with her on the day of the incident. He testified briefly as to those matters in plaintiff's case in chief.

Defendant's Version

According to defendant, the convertible "cut [her] off" in a lane change on Route 36 while plaintiff was talking on her cell phone. Defendant was driving a Chrysler Town and Country van at the time.

After the lane change, the convertible "came to a complete stop." Defendant testified that she put her hands up and gestured to plaintiff, "What are you doing?" Defendant acknowledged that she then "pulled over to the side of [plaintiff's car], rolled

down [her] window," and exclaimed, "[W]hat are you doing, get the F--- off the phone[.]" Defendant then "moved on."

According to defendant, the vehicles thereafter stopped at a traffic light, with the convertible in the right lane and defendant's van in the left lane. Defendant claimed that, at that point, plaintiff got out of her car with the miniature bat. Plaintiff said, "Did [defendant] want to be beaten and did [defendant] want to be arrested[,]" all allegedly while she "held the club over [defendant's] windshield." Defendant stated that she was "scared" as plaintiff did this.

At that point, plaintiff's car door on the driver's side was open. According to defendant, the door was on an angle and intruding into defendant's lane. Defendant claimed that she could not see plaintiff's door in front of her car "because [plaintiff's] window was down and she was standing at [the van's] windshield." Defendant testified that she then thought to herself, "[H]uh, she's got a club, I'm getting out of here."

According to defendant, at that point she "[t]urned [her] wheel towards the barrier to try to miss [plaintiff] and [plaintiff's] door because she was still standing there." Defendant testified that

> as I caught the door I went about 36, 42 inches
> and I realized I was -- I heard the scraping,
> I went (gasp) and I stopped. I back[ed] up

just a little bit to unhook myself and I pulled around and went and pulled over before the light[.]

Defendant claimed that she did this because she was "scared, trying to get away from [plaintiff]."

Defendant admitted causing damage to plaintiff's car door. However, she denied causing the additional damage to the car depicted in photographs that were introduced by plaintiff at trial.

According to defendant, after striking plaintiff's car, she pulled over to the side of the road. She was "parked on the same side of the accident[,]" about ten feet away from plaintiff. Defendant then called 4-1-1 to get the number for the Hazlet police department. She thereafter spoke with the police, after someone at a nearby store apparently called them.

The Police Officers' Testimony

Two Hazlet police officers, one female and one male, were called by defendant as trial witnesses. They recounted that they had arrived at the scene, and spoke to both drivers. The female officer recalled that defendant was "visibly upset" and crying. Defendant told the officer about the bat that plaintiff had allegedly used to threaten her. The officer then retrieved the miniature bat "from in between the driver's seat and the center console" of the convertible.

A-1762-15T3

After obtaining defendant's side of the narrative, the female officer spoke with plaintiff. However, the officer did not learn much from that conversation, because plaintiff was "very vague" and "really didn't want to give much information." Plaintiff did admit to the officer that she had opened her car door. The male officer similarly testified that he spoke to plaintiff, but recalled she was not "forthcoming" with her answers.

The male officer testified that, when he arrived, plaintiff's car was blocking traffic in the left lane, and other cars could not get around her open door. The female officer testified that plaintiff's car was "on an angle" and "closer to the left side of its lane[,]" but still "within its lane[.]"

According to the female officer, she was not aware of any eyewitnesses to the incident being present when the two officers arrived. The officer maintained that, contrary to plaintiff's claim, she did not tell any witnesses to leave.

<u>The Jury Charge and the Verdict</u>

During the charge conference, defense counsel requested that the court instruct the jury with <u>Model Jury Civil Charge</u> 5:10(g), addressing a "sudden emergency." Defense counsel argued in this regard that defendant had attempted to drive away from the scene because she was in fear of plaintiff, who was "out of the car with her bat." Although defense counsel conceded that the requested

10

instruction was "not a favored charge in our law," he argued that the circumstances of this automobile accident were not "standard" and the situation justified the charge.

Plaintiff's counsel strenuously opposed the issuance of the sudden emergency charge. He argued that the charge was unduly prejudicial to his client and would confuse the jury. He maintained that the customary charge for comparative negligence, which the court planned to give, provided sufficient guidance to the jury here in determining whether defendant and plaintiff had each acted reasonably under the circumstances. He also argued that, if the charge were given for defendant, it must also be given for plaintiff.

After reflecting on the matter, the trial court decided to charge the jury on only defendant's alleged sudden emergency, and included that charge in the final instructions, over plaintiff's objection. The court did recognize the charge is generally disfavored, but concluded that it was appropriate to give the jury in this particular situation of alleged "road rage" between two drivers.

During summations, counsel for plaintiff attempted to negate the impact of the court's forthcoming charge on sudden emergency. He argued that defendant, rather than plaintiff, was the negligent party in the overall encounter. More pointedly, he asserted that

11

defendant herself had created an emergency at the scene through her own vulgarities and aggressive conduct, which made plaintiff fearful. Hence, argued plaintiff's counsel, the damage that defendant caused to plaintiff by her own wrongful behavior could not be excused.

Defense counsel did not allude to the emergency charge in his own closing. We presume he was satisfied that the jury hearing the charge from the court itself was sufficient for his own tactical advantage.

The jury unanimously found defendant not liable on all three counts. This appeal ensued.

II.

The singular issue before us is whether the trial court erred in issuing the sudden emergency charge, and, if so, whether that error was sufficiently prejudicial to warrant a new trial.

The sudden emergency doctrine stems from the English common law dating back to Jones v. Boyce, 1 Stark. 493, 171 Eng. Rep. 540 (N.P. 1816), in which the plaintiff had leapt out of a stagecoach after being scared by the negligent manner in which the coach was being driven. The English court instructed that if the plaintiff had acted negligently in leaping from the stagecoach due to a perception of a sudden emergency, his negligent conduct could be excused. Id., 171 Eng. Rep. at 541. On the other hand, if the

12

plaintiff's act resulted from a rash apprehension of danger, which was not confirmed to exist, he would not be entitled to recover.

The United States Supreme Court adopted the sudden emergency doctrine in Stokes v. Saltonstall, 38 U.S. 181, 10 L. Ed. 115 (1839). That case likewise involved a passenger who had become frightened and leapt from a stagecoach.

For the sudden emergency doctrine to apply, and therefore potentially warrant the related jury charge, "a party must have been confronted by a sudden emergency over which he had no control, without fault on his part." Roberts v. Hooper, 181 N.J. Super. 474, 478 (App. Div. 1981). The doctrine "negates negligence if the jury finds that the party chose one of alternative reasonably prudent courses of action, even though, by hindsight, another course of action would have been safer." Id. at 478-79.

Many years ago, our state adopted this model charge. However, over time, the charge has been regarded as unnecessary, confusing, and conceptually subsumed within the charge for comparative fault.

The model charge reads as follows:

> In connection with the question of (contributory) negligence, it has been asserted that the defendant (plaintiff) was confronted with a sudden emergency. Where a person, without any fault on his/her part, is confronted with a sudden emergency, that is, is placed in a sudden position of imminent peril not reasonably to be anticipated, the law will not charge him/her with negligence

if he/she does not select the very wisest course in choosing between alternative courses of action. An honest mistake of judgment in such a sudden emergency will not, of itself, constitute negligence, although another course might have been better and safer. All that is required of such a person is that he/she exercises the care of a reasonably prudent person under like circumstances.

It is for you the jury to determine from the evidence <u>whether such an emergency existed, whether it arose without the fault of that person and whether that person acted with due care under the circumstances</u>.

[The following two additional paragraphs may be utilized where necessary:]

The law recognizes that one acting in a sudden emergency may have no time for thought and so cannot weigh alternative courses of action but must make a speedy decision which will be based on impulse or instinct. What is required of a person in such an emergency is that he/she act reasonably and with ordinary care under such circumstances.

However, if the emergency arose in whole or in part by reason of the fault, that is, a lack of due care, of that person in the events preceding the emergency, then this rule of sudden emergency <u>does not apply to excuse him/her even though his/her conduct during the emergency does meet the standard of reasonable care referred to</u>.

[<u>Model Jury Charge (Civil)</u>, 5:10(g), "Sudden Emergency" (emphasis added).]

In 1995, the Model Civil Jury Charge Committee added a "Note to Judges" indicating that the sudden emergency charge is in "disfavor." The Note cautions that the modern view is that the

14

charge is argumentative, confusing, and should be eliminated, citing this court's opinion in <u>Finley v. Wiley</u>, 103 <u>N.J. Super.</u> 95 (App. Div. 1968), which criticized the charge.  <u>See</u> <u>id.</u> at 103.

In <u>Leighton v. Sim</u>, 248 <u>N.J. Super.</u> 577, 580 (App. Div. 1991), we further admonished that the sudden emergency instruction should only be given in "the most unusual circumstances."  Although several states have retained the charge, others have eliminated it.  <u>See</u> <u>Moran v. Atha Trucking</u>, 208 <u>W. Va.</u> 379, 387-88, 540 <u>S.E.</u>2d 903, 911-12 (1997) (canvassing the law of various states).

In light of these cautionary developments, we conclude that the trial court erred here in acceding to defense counsel's request to issue the charge.  The charge essentially gives the jury an explicit judicial imprimatur that a litigant's conduct in a negligence case can be excused if he or she was responding to an emergency.

Here, the emergency was portrayed as, or assumed to be, one caused solely by plaintiff.  However, viewing the divergent testimony of the parties as a whole, plaintiff was arguably as much confronted with a "sudden emergency" here as was defendant, depending on whose account of events is believed.

This is not a situation in which an emergency was caused by a third party or some external force, such as when a defendant driver must change lanes in order to make way for an ambulance and

15

collides in the process with another vehicle. The alleged emergency, if one existed at all, instead was generated by the escalating argument between the two drivers, neither of whom was manifestly without fault. Indeed, defendant, whose counsel requested the charge, herself admitted that she had shouted and cursed at plaintiff after being cut off in her lane.

Given the competing proofs, the standard charges on negligence and comparative fault sufficed here for the jury to fairly weigh the respective behavior of the two actors involved. By hearing from the judge's lips the disfavored charge on sudden emergency, which was obtained for defendant's sole benefit, the jury's objective consideration of the evidence easily could have been tainted.

"It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Velazquez v. Portadin, 163 N.J. 677, 688 (2000) (alteration in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)); see also Washington v. Perez, 219 N.J. 338, 350-51 (2014) (noting that "[o]ur law has long recognized the critical importance of accurate and precise instructions to the jury"). "A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations[.]" Das v. Thani, 171 N.J. 518, 527 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)).

Although we appreciate the fact that the sudden emergency charge remains on the books, and that the trial court responded to defense counsel's request in a conscientious manner, we conclude that it was harmful error to give the charge in the context of this particular case.[5] This was not the appropriate rare case where the charge was warranted.

The judgment for defendant is reversed, and the matter is remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] Given the passage of time since it was last studied, we respectfully suggest that the Model Civil Charge Committee undertake a renewed assessment of the continued need for this model charge.

A-1762-15T3