789 A.2d 662 (2002)
347 N.J. Super. 268
SATELLITE ENTERTAINMENT CENTER, INC., t/a Wynny's and Morris Winograd, Plaintiffs-Appellants,
v.
John KEATON, Defendant-Respondent/ Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 2001.
Decided February 4, 2002.
*663 David Treacy, Woodbridge, argued the cause for appellants (Wilentz, Goldman & Spitzer, attorneys; Christine D. Petruzzell, of counsel; Ms. Petruzzell and Donna A. McBarron, on the brief).
Gerald D. Miller, Jersey City, argued the cause for respondent/cross-appellant (Miller, Meyerson, Schwartz & Corbo, attorneys; Mr. Miller, on the brief).
Before Judges PRESSLER, WEFING and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
In this appeal from a judgment based on a jury verdict, plaintiff argues that there are legal issues which warrant a reversal of that judgment. However, the fact is that the trial turned almost entirely on credibility issues, there were ample bases for the jury to reach the conclusions it did, and there is no basis for reversal. Accordingly, the judgment is affirmed in all respects, including the provisions thereof relating to plaintiff's complaint, those relating to defendant's counterclaim, and the trial court's denial of pre-judgment interest.
The essential characters in this drama are Morris Winograd, principal of the plaintiff corporation, Satellite Entertainment, Inc.,[1] who is an accountant and insurance broker, and also operates a bar and restaurant in Jersey City known as Wynny's, and defendant John Keaton, who worked most of his life as a mechanic but began operating a barbecue restaurant in Jersey City in 1993. Winograd and Keaton had known each other for many years and had a business and semi-friendly relationship. Keaton said that from the time when he was a young man, he had obtained his insurance from Winograd and over the years, the two had numerous contacts. Keaton said he thought the two had a good relationship.
As Keaton described his entry into the barbecue business, in August 1993, he realized he "was getting up in age and I knew they did not hire mechanics" of that age.
*664 He also knew how to barbecue ribs and, with the encouragement of his daughter, he opened discussions with George Williams, who owned premises at 547 Martin Luther King Drive in Jersey City. Those discussions evolved into a six year lease under which Keaton occupied a portion of the premises for his barbecue business. The premises also included a bar and dance hall and a second-floor apartment in which Williams resided. The lease ran from 1993 to 1999, with a monthly rental of $700. Keaton then opened his restaurant whose "specialty was in barbecue ribs," and he continued to operate that business from 1993 until the end of 1995.
In March 1995, Winograd loaned Keaton a sum of money, and Keaton signed a note acknowledging that debt. The amount of the loan was disputed. The note is in the face amount of $6,000, and it says nothing about interest rate. Winograd said that Keaton had asked him for the loan so he could purchase ribs in large quantities and in that way save money. Winograd said further that he delivered the money, $6,000, to Keaton, in cash.
Keaton testified that he signed the note before any of the information (including the face amount) had been inserted. He said further that the amount paid to him was just $5,000, and he further testified that in September 1995, he repaid that entire $5,000 to Winograd, in cash. Winograd, on the other hand, insisted that he had advanced $6,000 to Keaton and claimed that in September 1995, Keaton repaid him just $1,500. Thus, Winograd maintained that $4,500 remained owing on the note, while Keaton maintained that the note had been repaid in full.
That promissory notewhich is not reproduced in either party's appendix formed the subject matter of Winograd's complaint against Keaton. On that complaint, the jury returned a verdict of $1,000 in favor of Winograd, which would seem to indicate it had accepted Winograd's testimony that the loan had been for $6,000, but it had also accepted Keaton's testimony that he had repaid $5,000 to Winograd. That last conclusion seems particularly likely since, at trial, Keaton presented two apparently independent witnesses to corroborate his repayment of the note, one of whom was a teacher in a Jersey City high school who said she personally counted out the $5,000 in cash presented by Keaton and turned it over to Winograd.
While Keaton was operating his barbecue restaurant, the owner of the real property, George Williams, told Keaton that he was having financial trouble. He asked if Keaton was interested in buying the property and when Keaton replied that he was not in a position to do so, Williams suggested that Keaton make an effort to find some other interested purchaser. Keaton thought of Winograd-indeed, he testified that Winograd was the only person he knew who might be in a position to buy the propertyand he mentioned the possibility to Winograd. Winograd expressed interest. Although the chronology becomes somewhat confusing, what is clear is that Williams died at some point after his discussion with Keaton about purchasing the property, and at some time thereafter, Keaton began making his rental payments to an entity known as Mercury Capital, which may have been Williams' mortgagee. Eventually, however, Winograd purchased the property and determined to renovate the entire premises, including that portion occupied by Keaton's barbecue restaurant as well as the adjacent restaurant and bar. His plan was to open and operate a new, more elaborate restaurant and bar to be known as Wynny's.
According to Keaton, in or about September 1995, Winograd raised the question *665 of buying out Keaton's business, and asked him for a price. Keaton said he answered by naming a price of $175,000. He said Winograd responded positively to that price and told Keaton that he would pay it. According to Keaton, Winograd also said he wanted Keaton out of the property by the end of 1995, and he wanted Keaton to help him establish and run his new enterprise. Keaton said he agreed to do so. Keaton did in fact vacate the premises by December 1995, and, beginning in or around January 1996, Winograd began renovations and also began paying Keaton a weekly salary for his services respecting Winograd's new bar and restaurant.
Keaton presented a number of witnesses to corroborate what he described as Winograd's promise to pay him $175,000 for his business. One was Rolanda Taylor, a bartender employed by Winograd, who testified that on two occasions, she heard Winograd agree to pay Keaton that amount. The first time, she said, was in May 1996, when Keaton asked Winograd, "is he still going to pay him the hundred and seventyfive thousand for his business"? She said Winograd replied, "Yes, you're goingI already told you that I was going to pay you. I already told you seven times I was going to pay you." The second occasion, she said, was in April 1997, at a final meeting, when Winograd terminated his relationship with Keaton, Taylor and some others who had been operating Winograd's bar and restaurant. She said at that meeting, Keaton had reminded Winograd of his obligation to pay him $175,000, and, she said, Winograd replied, "I heard you, I told you I was going to pay you, and he walked out the door."
A second witness presented by Keaton was Dolores Boyce, the high school teacher referred to above, who said that when she counted out the $5,000 which Keaton repaid to Winograd under the original promissory note, she also heard Keaton ask Winograd to bring him his $175,000 note, to which Winograd replied, "I will."
Finally, in addition to supporting testimony from his daughter, Keaton also presented the testimony of Maribelle Bonilla, who had worked as a bartender during the early days when Wynny's was beginning its operations. She too described the final meeting in April 1997, at which Winograd terminated a number of employees, including Ms. Bonilla. She said that, at the meeting, "John Keaton approached him [Winograd] and asked him about his business. He [Keaton] said he [Winograd] owed him a hundred and seventy-five thousand for his business. Winograd said that he heard him. That he was going to pay him. He said, I heard you already. As he was walking out the door, he said he was going to pay him his money."
Winograd denied ever agreeing to pay Keaton anything for his barbecue business. At trial, his counsel contended that the assets of Keaton's business had little if any value, that its earnings were negligible, and whatever value it may have had did not approach $175,000. He claimed further that Keaton had willingly terminated operation of his business so that he could accept employment as manager of Winograd's new establishment, where he would be paid $800 per weekmore than he ever could have earned from his barbecue restaurant.
As noted, however, the jury accepted Keaton's version of the agreement between him and Winograd, and awarded Keaton $175,000 on his counterclaim. Since, as noted above, it awarded $1,000 to Winograd on his complaint, the result was a net award of $174,000 in favor of Keaton. The court then entered a judgment to that effect which, initially, included an award of $22,263 in pre-judgment interest. Plaintiff subsequently moved to set aside the judgment *666 and for the award of either a judgment notwithstanding the verdict or a new trial. The court denied the motion, but did rule that pre-judgment interest would not be awarded. It then entered an order to that effect, denying the request to set aside the verdict but also determining that Keaton would not receive pre-judgment interest.
On this appeal, Winograd claims that the verdict in favor of Keaton was against the weight of the evidence and should be set aside; that the court erred in improperly excluding evidence he offered in defense of the counterclaim; and that the alleged agreement calling for Winograd to pay $175,000 to Keaton should not be enforced because it did not include the essential terms of an enforceable contract. We find no merit in any of the arguments.
First, a jury verdict should be set aside only when it "clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). See Goss v. American Cyanamid, Co., 278 N.J.Super. 227, 239, 650 A.2d 1001 (App. Div.1994). "The standard for our setting aside a verdict already sustained by the trial judge is high." Horn v. Village Supermarkets, Inc., 260 N.J.Super. 165, 178, 615 A.2d 663 (App.Div.1992), certif. denied, 133 N.J. 435, 627 A.2d 1141 (1993). Only when "`it clearly and convincingly appears that thee was a manifest denial of justice under the law'" should such a verdict be disturbed. Dolson v. Anastasia 55 N.J. 2, 6-8, 258 A.2d 706 (1969). Winograd fell far short of meeting that standard here.
There was ample basis on which the jury could decide to accept Keaton's version of the agreement between him and Winograd. Not only was Keaton himself unequivocal in describing that agreement, but Keaton presented three independent witnesses (plus his daughter) who corroborated Winograd's repeated promise to pay Keaton $175,000 for his business. We see no reason to assume that all those witnesses were lying.
Nor are we persuaded by Winograd's argument that such an agreement was inconceivable because Keaton's business did not have a value close to $175,000. Keaton argues, persuasively, that Winograd was not particularly interested in buying the tangible assets or good will of Keaton's business. What Winograd wanted, and what Winograd was willing to pay for, Keaton argues, was Keaton's occupancy and right to continue to occupy a portion of the premises in which Winograd wanted to develop and operate his new bar and restaurant. It was that space which Winograd wanted, Keaton argues, and for which Winograd was willing to pay $175,000. And, Keaton further argues, at trial Winograd testified that after he completed his purchase from Keaton, he expended between $700,000 and $750,000 to improve the property for his proposed new operation. Viewed in the context of that expenditure, the $175,000 which Winograd agreed to pay in order to terminate Keaton's interest in the property, was not excessive and was indeed relatively modest.
We also reject the claim that Winograd's contractual undertaking to pay $175,000 to Keaton should be invalidated for lack of specificity concerning the terms of the contract. The basic terms of this very simple agreement were clear.
First, the price was firm: it was $175,000. So too was the description of what Winograd was purchasing. He was buying all of Keaton's business, including whatever tangible assets, inventory or "good will" might be involved. However, as discussed above and as Keaton's attorney emphasizes, none of those assets were particularly significant to Winograd.
*667 Thus, it is not surprising that the parties did not, for example, itemize with specificity the inventory or the furniture of Keaton's business which was to be turned over to Winograd. To Winograd, those details were unimportant. The critical point, and the real reason for Winograd's payment of $175,000, was Keaton's agreement to vacate the property by the end of 1995, which he did.
Winograd also argues that the contract was too vague for enforcement because there was no description of the interest rate or the due date of the note to be given by Winograd in payment for the business. Keaton concedes that the note contained no provision for interest, and thus he had no right to interest. He claims further that without a specified due date, the note should be regarded as due on demand.
It is a settled principle that when the essential parts of a contract are spelled out, a court will not refuse to enforce that contract because some of its less critical terms have not been articulated. In such a case, the court will imply a reasonable missing term or, if necessary, will receive evidence to provide a basis for such an implication. See Paley v. Barton Savings & Loan Assoc., 82 N.J.Super. 75, 83, 196 A.2d 682 (App.Div.), certif. denied, 41 N.J. 602, 198 A.2d 446 (1964); Comerata v. Chaumont, Inc., 52 N.J.Super. 299, 145 A.2d 471 (App.Div.1958). And that is particularly true when there has been part performance of the contract, oras here where one of the parties (Keaton) has fully performed his part of the bargain. See Comerata at 305-06, 145 A.2d 471.
In support of his claim of invalidity because of vagueness, Winograd relies on a number of cases in which critical, essential parts of a contract were missing and the contract was so vague or indefinite that it could not realistically be enforced. See Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 24-25, 138 A.2d 402 (1958) (the terms were so vague that the intent of the parties could not be determined); Weichert Realtors v. Ryan, 128 N.J. 427, 435, 608 A.2d 280 (1992) (the contract lacked essential terms so that the obligation of each party could not realistically be ascertained). Winograd relies primarily, however, on Malaker Corp. v. First Jersey Nat'l Bank, 163 N.J.Super. 463, 395 A.2d 222 (App.Div.1978), certif. denied, 79 N.J. 488, 401 A.2d 243 (1979), where an alleged contract was found to be lacking essential terms necessary for enforcement. Although the missing provisions there dealt with interest rates and terms of repayment of loans, that case is markedly different from ours. It involved an alleged agreement to extend a line of credit. Thus, the nature of the line of credit and the terms thereof, including interest rates, terms and time of repayment and such items as the need for and nature of collateral, were essential provisions that went to the heart of the alleged agreement. Here, on the other hand, the heart of the contract is the dollar amount to be paid to Keaton and Keaton's obligation to vacate the premises for Winograd's use. The incidental terms of the note to be given in payment were just that: incidental terms, which do not bar enforcement of the essential agreement between the parties.
Finally, Winograd complains of the trial court's rejection of proffered testimony designed to show that after Keaton closed his business and began working for Winograd, he was functioning as Winograd's manager rather than simply an employee working in the establishment. At trial, Winograd urged admissibility of that evidence for what he termed its impact on Keaton's "credibility," since Keaton had denied functioning as a manager.
*668 We agree with Winograd that, under N.J.R.E. 607, the proposed evidence was admissible and the court should have accepted it. However, we see no prejudice and certainly no substantial prejudice from the ruling. There was no dispute as to the salary being paid by Winograd to Keaton, and we fail to see any major significance in the title bestowed on Keaton. If Winograd's point was that Keaton had simply ended his own business venture in order to accept a more lucrative position with Winograd, then Winograd had already made that point. Any question of Keaton's title would not have advanced his argument any further. Indeed, it is difficult to believe that any aspect of the argument based on Keaton's employment was likely to have a persuasive effect. If the job offered to Keaton was attractive, then it would have been so whether or not Winograd had also offered to pay $175,000 for Keaton's business. Keaton's acceptance of the position was not inconsistent with his description of the alleged contract of sale with Winograd.
We see no need for an extensive discussion of Keaton's cross-appeal from the trial court's denial of pre-judgment interest. It is clear that a trial court is vested with substantial discretion to award or deny pre-judgment interest in contract cases. Bak-A-Lum Corp. v. Alcoa Bldg. Prod., 69 N.J. 123, 131, 351 A.2d 349 (1976). See also Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 478, 541 A.2d 1063 (1988); Musto v. Vidas, 333 N.J.Super. 52, 74, 754 A.2d 586 (App.Div. 2000); In re Estate of Lash, 329 N.J.Super. 249, 261, 747 A.2d 327 (App.Div.2000). While it would have been preferable to have a statement of the court's reasoning, and why it determined to withhold such an award, we see no basis on which we could or should conclude that the action constituted an abuse of discretion.
Affirmed.
NOTES
[1] The judgment on appeal was entered only against the individual plaintiff, Morris Winograd, but the notice of appeal was filed in the name of both the individual and the corporate plaintiffs. References hereinafter to "plaintiff" are deemed to refer to Morris Winograd although, where applicable, include the corporate plaintiff as well.