**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5664-14T3

YOAV KRILL,

    Plaintiff-Respondent,

v.

IDT CORPORATION, INC.,

    Defendant-Appellant,

and

HOWARD JONAS,

    Defendant.

_____

Argued March 16, 2017 — Decided July 21, 2017

Before Judges Alvarez, Accurso and Manahan.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-2012-
13.

Jason C. Cyrulnik (Boies Schiller & Flexner
LLP) of the New York Bar, admitted pro hac
vice, argued the cause for appellant (Reed
Smith LLP, and Mr. Cyrulnik, attorneys; Mr.
Cyrulnik, of counsel and on the brief; Daniel
Mateo, on the brief).

Leonard Z. Kaufmann argued the cause for
respondent (Cohn Lifland Pearlman Herrmann &
Knopf LLP, attorneys; Mr. Kaufmann, on the
brief).

PER CURIAM

Defendant IDT Corporation, Inc.[1] appeals a jury's verdict after a three-day trial awarding $1.5 million in damages to plaintiff Yoav Krill on his breach of contract complaint. For the reasons that follow, we affirm.

At the close of Krill's case, IDT unsuccessfully moved for a directed verdict. In denying the motion, the judge observed that "the ultimate determination of the facts is going to rest with findings of credibility . . . within the purview of the jury alone." The jury verdict sheet, tracking the complaint, presented the issues in readily understandable terms, to which the jury responded definitively:

> 1. Did Plaintiff Yoav Krill and IDT Corporation form a contract? YES; 8-0.
> 2. Did IDT breach the contract with Yoav Krill? YES; 6-2.
> 3. Did IDT breach the implied covenant of good faith and fair dealing? YES; 8-0.
> 4. Did Yoav Krill incur damages a result of the breach of the contract? YES; 8-0.
> 5. What is the amount of damages incurred by Yoav Krill as a result of the breach of the contract? $1.5 million; 6-2.

In her statement of reasons denying defendant's motion for judgment notwithstanding the verdict (JNOV), the judge first

---

[1] The only count in the complaint naming defendant Howard Jonas, the fifth count, alleged common-law fraud. That count against him and IDT was dismissed on November 7, 2014, on partial summary judgment.

correctly stated the standard for determining such applications. She next reviewed the testimony developed during the trial, concluding:

> Ultimately, the jury's verdict involved weighing issues of credibility on material facts. The jury charge was without objection and included that consideration and specificity were two necessary elements that they must find in order to return a verdict in favor of plaintiff. In sum, the court finds that reasonable minds could differ, and there were significant issues of credibility which were resolved by the jury in plaintiff's favor.

By way of background, Krill became employed by IDT in May 1998, the same year he met Jonas, with whom he became friends. IDT is a telecommunications company having its principal place of business in Newark. Krill has advanced degrees in various subjects including mathematics. Before working for IDT, he was employed at LL Airlines, Basic Israel Telecom, and Alcatel. Krill developed international service for IDT, traveling frequently between Europe and New Jersey.

The year he first began to work for the company, Krill assisted Jonas through an employee challenge to Jonas' management. When IDT expanded in 1999, Krill became a senior vice president and general director of IDT Europe. He traveled throughout the globe, building telecom connectivity, including the installation of submarine cables from Europe to Israel and Egypt. He was

A-5664-14T3

instrumental in the installation of trans-Atlantic and trans-Pacific cables for IDT.

Krill lived in Switzerland, from where he managed IDT's subsidiaries and global operations. His annual compensation in the 2000s ranged from $150,000 to $200,000 annually, with bonuses in one year of $1 million. In April or May 2007, Krill advised Jonas that he wanted to retire in 2008 upon attaining age sixty-seven, as he would then be eligible for certain retirement benefits in Israel. Jonas agreed to accommodate him, and to allow him to continue working until September 2008, when he would attain the necessary age. Krill's annual compensation was increased from $150,000 to $190,000.

In May 2008, Krill learned from Shmuel Jonas, Jonas' son, that Krill would be terminated by the end of the month. Krill immediately contacted Jonas, who agreed to allow Krill to stay on until September. Despite these assurances, on June 3, 2008, Krill received an email from managing counsel for IDT Labor and Employment, advising him that his separation and release agreements were available.

When Krill returned to his office from Israel, it was only to find he was locked out and that his access card for entry into the building no longer worked. Jonas' son advised that he would not be paid if he did not sign the release and separation

agreement. As a result, Krill retained counsel, Bruce Johnson, Esquire, who wrote to IDT's Labor and Employment attorney, advising that he had been retained to represent Krill. On June 9, 2008, Krill contacted James Courter, the IDT Chief Executive Officer (CEO), and protested his termination. On June 12, 2008, Jonas contacted Krill and advised that the termination had been an error, and agreed his employment could continue until September 2008.

On June 26, 2008, Johnson wrote to IDT seeking to enter into a written agreement for a $3.5 million severance package, asserting that Krill had been fired based on his age and nationality, and treated unlike similarly situated managers who upon separation received substantial severance pay. The letter specifically referred to Krill's intent to file suit in the event no agreement could be reached.

The following day, Jonas called Krill and on July 2, the men met at a restaurant. During the meeting, Jonas explained that the company was encountering some financial difficulties. They agreed to meet to engage in further discussions, ultimately rescheduling to July 10.

When Krill met with Jonas, he demanded $3.5 million based on his knowledge of other IDT employees who received severance packages upon the conclusion of their service to the company. For

example, Krill mentioned his own assistant, who received a $2.5 million severance payment.

Krill and Jonas met again on July 30, 2008, at which point according to Krill the men agreed he should be paid $2.5 million. Because IDT was experiencing financial difficulties, Jonas said the money could not be paid immediately.

Krill testified that Jonas agreed to pay $250,000 in salary for four years, and two additional payments of $800,000 and $700,000. In return, Krill agreed to be available for additional work for IDT as necessary over the next four years, and that he would forego suing the company because the parties had arrived at an agreement. On cross-examination, Krill appeared to contradict himself and stated that he did not agree to release any "hostile claim" he may have had.

During his July 30, 2008 meeting with Jonas, Krill called his attorney on speakerphone, and reviewed the terms of the agreement the two men had reached. Jonas, according to Johnson's testimony, confirmed the financial terms, and said that Johnson and Ira Greenstein, a lawyer who represented that he was the president of IDT, would finalize the terms. Krill later advised Courter, who was present for part of the meeting, that a deal had been struck.

Krill's salary and work privileges were reinstated in August 2008. In August and September, Krill, Johnson, and Greenstein met

regarding the agreement. Greenstein advised it was his job to arrange for the $1.5 million additional payments, and that Dov Schwell, an IDT attorney, would arrange for the four annual $250,000 payments. At one of these meetings, Greenstein said that the $1.5 million would be financed through an affiliate company. At trial, Krill testified that Greenstein never questioned the $2.5 million figure. Greenstein did not testify.

On September 24, 2008, Jonas called Krill to confirm the agreement, but mentioned that there were difficulties in obtaining the money. He offered to immediately pay $625,000 and cut the lawyers out of the deal. Krill refused.

In the summer of 2009, Krill and Courter met at the Newark Club. Krill testified that Courter confirmed that Jonas had agreed to the settlement.

Throughout the four years he was paid $250,000 annually by IDT, Krill was the chairman of a business known as Suspect Detection Systems, from which enterprise he received stock options. IDT was aware of his involvement and did not object. IDT never paid Krill the $1.5 million in additional payments.

During his four years of receiving the $250,000 payments, Krill assisted in a lawsuit involving Tyco. He may have also been involved in a deposition in a case against Telligent, but could not recall the date. Krill said that neither he nor Jonas

discussed a release, non-compete, or non-disparagement agreement. No more specific discussion regarding the work that Krill would perform was ever conducted.

Krill, at least, did not consider that unusual. He had never had a written agreement with Jonas regarding his employment. When shown a copy of a proposed 1998 employment agreement bearing his signature, Krill identified the document at trial as merely a proposal presented by his own attorney when he first began to work for IDT. It was never signed by the company. Krill said that the chief operating officer of the company told him that IDT did not enter into written agreements for executives.

On cross-examination, Krill was asked about the failure of the parties to have entered into a written agreement, and whether that was the result of the absence of any "meeting of the minds between [he] and IDT[.]" Krill responded, "correct."

Johnson's account corroborated Krill's testimony. He recalled that during the July 30 phone call, Jonas confirmed that IDT would pay Krill $250,000 per year for four years, would also pay $800,000 immediately, and $700,000 at a later date. Johnson could not remember the date that was discussed. When he said that some form of security would be necessary to guarantee the payments, Jonas agreed.

Johnson also recalled meeting twice with Krill and Greenstein, and discussing how the money would be obtained to pay Krill. Greenstein stated that Schwell would be processing the $250,000 annual payments, and that Krill would be providing additional services for that compensation. The additional services would include working on a dispute involving Tyco, remaining chairman of the board of IDT Europe, assisting IDT in negotiations with the IRS involving the sale of NotetoPhone, and facilitating an opportunity for IDT to invest in Suspect Detection Systems, Ltd., in which Krill had been heavily involved.

Johnson recalled Greenstein saying that he was personally attempting to obtain the remaining $1.5 million, which Johnson understood would be paid in an initial, secured $800,000 payment within sixty days, possibly coming from another corporate entity, while the remaining $700,000 would also be secured, but paid in yearly increments. After the meeting, Johnson received an email from Greenstein to the effect that he should be able to deliver as discussed within a sixty-day timetable.

Johnson also testified that Schwell was not aware of the $800,000 and $700,000 payments, and was involved only in drafting an employment agreement. The document Schwell prepared included the $250,000 annual compensation but not the remaining $1.5 million. Johnson marked up the employment agreement and sent an

email to Greenstein, suggesting that perhaps some discussion should be had with Schwell because Schwell was unaware of the terms that Krill and Jonas had reached.

Johnson's proposed changes to the Schwell agreement revised the scope of Krill's employment. Johnson's changes were: that Krill was not required to work in Newark nor required to devote his efforts to the company full-time, increased Krill's compensation in the fourth year from $175,000 to $250,000, removed a provision which would have nullified prior bonuses, removed a "release" provision, added an indemnification clause for Krill's benefit, amended the terms regarding termination to ensure that Krill would be paid the $1 million annual installments he had been promised, and modified the merger clause to allow the parties to enter into other agreements because there might be other understandings that the parties would reach related to Krill's employment.

Johnson sent the marked-up document to Schwell, but never received any communication that the changes were unacceptable or negotiations broken off. No written agreement was ever reached.

In the email to Greenstein, Johnson had also sought an update on the $1.5 million additional payments. Greenstein had reaffirmed that he was responsible for funding those payments.

Johnson met again with Greenstein and Krill on September 2, 2008, to discuss securing the $1.5 million payments. Greenstein confirmed IDT was still committed to the same terms that Jonas had confirmed to Johnson on July 30, 2008. They discussed including language in the employment agreement Schwell was drafting regarding Krill's entitlement to additional bonus payments, and discussed drafting a side letter or a side agreement in which plaintiff agreed to waive any age-related claims against IDT. Greenstein asked for wiring instructions for the $800,000 installment because another company other than IDT would be making the payment and did not have that information.

Johnson and Greenstein subsequently communicated regarding the security for the $1.5 million payment. No one ever advised Johnson that IDT was not going to complete the transaction, nor did anyone from IDT ever advise him that the company had not entered into an agreement to pay Krill a total of $2.5 million. Johnson was adamant that he was attempting to memorialize an agreement that had been already reached between Krill and Jonas.

Although Greenstein did not testify, Schwell did. At the time of these negotiations, he had been employed as in-house counsel for IDT. His testimony was that the reason no written agreement was entered into was that key terms were not agreed upon, including minimum performance standards, IDT's right to

11

termination, releases, indemnities requested by Krill, and the insertion of a merger clause. He also stated that he was only responsible for the $250,000 a year payments, and that he had no knowledge of the additional $1.5 million settlement. He never specifically broke off negotiations because the parties could not agree on terms. He acknowledged that despite the absence of a written agreement, Krill was paid $250,000 a year for each of four years.

Courter, although he was not present during the meetings between Krill and Jonas, confirmed he met with Krill at the Newark Club. Contrary to Krill's testimony, he said that he told Krill there was no agreement.

Courter was the only witness who testified it was standard practice for the company to enter into written agreements with high-level employees, a fact disputed by the other witnesses, including those testifying for IDT.

Jonas testified that he had agreed to pay Krill half of his salary and keep him on part-time for four years until he reached retirement age in Israel. His son mistakenly fired Krill four months before he became eligible. Although Jonas acknowledged receiving a letter from Krill's attorney demanding $3.5 million, he thought the amount was ridiculous considering that Krill had already received close to $800,000 for the last four years.

12

Furthermore, Jonas claimed that he agreed to keep Krill on IDT's payroll for four more years with an annual salary increase to $250,000, if he was able to do so, only because Krill had been diagnosed with thyroid cancer, and his wife had health issues as well. He denied the payments were made pursuant to an agreement.

In deposition, however, Jonas had confirmed that IDT agreed to pay Krill in exchange for his availability and his decision not to sue the company for wrongful termination. He also acknowledged that even though Krill had agreed to remain available, there were no specific responsibilities he was expected to fulfil during this period of time.

Jonas denied agreeing to pay Krill the additional $1.5 million in severance. He acknowledged having a meeting during the course of which Johnson was on the phone, however, he said that the conversation was like "watching a movie" because he never agreed to anything. He denied being put on speakerphone, denied confirming a $2.5 million payment with Johnson, denied ever speaking with Johnson, and insisted he did not even know what his voice sounded like. Jonas further testified that Greenstein held a ceremonial title as president of IDT, but did not have the authority to commit to payments on behalf of IDT.

Now on appeal, IDT raises the following points for our consideration:

I. JNOV Dismissing Krill's Claim Should Be Granted Because The Undisputed Evidence Showed That The Parties Never Reached Agreement On A Release From Krill To IDT — A Term That Krill Himself Alleged To Be Material.

II. The Parties' Undisputed Failure To Reach Agreement On The Terms Of Krill's Purported Employment Warrants JNOV In IDT's Favor, Or, At A Minimum, A New Trial.

III. At A Minimum, IDT Is Entitled To A New Trial Because The Evidence Shows That The Parties Did Not Intend To Be Bound By Their July 30 Meeting.

I.

A motion for a judgment notwithstanding the verdict under Rule 4:40-2 must be denied if the evidence, together with legitimate inferences therefrom, could sustain the judgment. Riley v. Keenan, 406 N.J. Super. 281, 298 (App. Div.) (citing Lanzet v. Greenberg, 126 N.J. 168, 174 (1991)), certif. denied, 200 N.J. 207 (2009). We do not weigh the evidence. Polyard v. Terry, 160 N.J. Super. 497, 505-06 (App. Div. 1978), aff'd o.b., 79 N.J. 547 (1979). Rather, we accept as true all evidence which supports the position of the party defending against the motion and accord the defending party the benefit of all inferences which can reasonably and legitimately be drawn. If reasonable minds can differ, the motion must be denied. Filqueiras v. Newark Pub. Sch., 426 N.J. Super. 449, 456 (App. Div.) (quoting

Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)), certif. denied, 212 N.J. 460 (2012).

This court's review of an order denying a new trial motion is limited to consideration of whether it clearly results in a miscarriage of justice under the law. R. 2:10-1; Dolson v. Anastasia, 55 N.J. 2, 5-7 (1969). Due deference is given to the trial court's "feel of the case." Jastram v. Kruse, 197 N.J. 216, 230 (2008) (citation omitted). Evidence is viewed in the light most favorable to the party opposing the motion, Caldwell v. Haynes, 136 N.J. 422, 432 (1994), and we do not substitute our judgment for that of the jury, granting the motion "only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Kulbacki v. Sobchinsky, 38 N.J. 435, 456 (1962)).

A "miscarriage of justice" has been described as a "pervading sense of "wrongness" needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-valuation of crucial evidence, [or] a clearly unjust result. " Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996) (alterations in original)

15

(quoting <u>Baxter v. Fairmont Food Co.</u>, 74 <u>N.J.</u> 588, 599 (1977)), <u>certif. denied</u>, 149 <u>N.J.</u> 34 (1997).

## II.

An oral contract requires a meeting of the minds, offer and acceptance, consideration, and sufficiently defined terms. <u>See</u> <u>Weichert Co. Realtors v. Ryan</u>, 128 <u>N.J.</u> 427, 435 (1992). An alleged contract is unenforceable if the parties do not agree on an essential term or if the essential term is not described with sufficient specificity to allow the performance of the parties to "be ascertained with reasonable certainty." <u>Ibid.</u> Vagueness is only fatal where "the contract [is] so vague or indefinite that it [can]not realistically be enforced." <u>Satellite Entm't Ctr.,</u> <u>Inc. v. Keaton</u>, 347 <u>N.J. Super.</u> 268, 277 (App. Div. 2002); <u>see</u> <u>Weichert</u>, <u>supra</u>, 128 <u>N.J.</u> at 435 (failure to include essential terms prevents recognition of parties' obligations); <u>West Caldwell</u> <u>v. Caldwell</u>, 26 <u>N.J.</u> 9, 24-25 (1958) (intent of parties could not be determined from vague terms).

"The mere anticipation of a written memorialization of an oral agreement does not as a matter of law vitiate an oral contract if the elements of a contract are contained in the oral agreement." <u>McBarron v. Kipling Woods, L.L.C.</u>, 365 <u>N.J.</u> <u>Super.</u> 114, 116 (App. Div. 2004). Parties may contract orally and be bound by that agreement, but the plaintiff must show that the

parties agreed upon all of the terms and if so, whether they intended an obligation to arise only on the execution of a formal writing. Trs. of First Presbyterian Church in Newark v. Howard Co.-Jewelers, 22 N.J. Super. 494, 502 (App. Div. 1952), aff'd 12 N.J. 410 (1953); see also McBarron, supra, 365 N.J. Super. at 116-17. Whether an oral agreement was intended not to bind the parties until a written contract was executed is a matter of intent determined in large part by a credibility evaluation of witnesses. McBarron, supra, 365 N.J. Super. at 117.

Forbearance from legal action is well recognized as a detriment sufficient to support a contract, i.e., consideration. Onorato Constr., Inc. v. Eastman Constr. Co., 312 N.J. Super. 565, 571 (App. Div. 1998). Even where it is not directly stated as consideration, it may exist by implication. Ibid. (citation omitted).

### III.

The jury, based no doubt on its conclusions regarding the credibility of the witnesses, found Krill and IDT entered into an enforceable agreement. Krill's testimony, if believed, when joined with other circumstances in the case, easily supports a judgment in Krill's favor. We accept this evidence as true, and give him the benefit of inferences which can be reasonably and

17

legitimately drawn therefrom. Filqueiras, supra, 426 N.J. Super. at 456.

In support of its position, IDT focuses on Krill's statement on cross-examination that he had not agreed to release defendant from any hostile claims during the July 30, 2008 meeting. That, however, was not his statement on direct. Krill was apparently believed in his direct testimony, and the jury disregarded his one-word response to a leading question on cross-examination. At the time of the trial, Krill was in his seventies, and had struggled with his health. Whether for this or other reasons, the jury chose to disregard his one-word answer in cross-examination.

In our view, reasonable minds can differ as to whether forbearance from suit was an expressly agreed upon term. Thus, the JNOV should not have been granted. See ibid. Furthermore, the jury knew that in the years since the agreement was reached, Krill did not file any other lawsuit against IDT. That the issue of Krill's forbearance from filing a discrimination suit was not clearly spelled out as a term did not invalidate the agreement overall.

In Satellite Entertainment Center, Inc., supra, 347 N.J. Super. at 270, 276, this court upheld a jury verdict for the defendant on his counterclaim, finding that a contract for the sale of his business to the plaintiff was sufficiently specific.

There, the defendant leased restaurant space from the plaintiff, and the plaintiff allegedly promised to pay the defendant $175,000 for his business if he vacated by the end of 1995 because he had other plans for the space. Id. at 272-73. The defendant complied but the plaintiff did not pay. Id. at 273. On appeal, the plaintiff argued, inter alia, that a contract for the sale of the business should have been invalidated for lack of specificity concerning the terms. Id. at 276.

We found the basic terms were clear, including the firm price of $175,000, and the description of the defendant's business assets being purchased, which would have included tangible assets, inventory and good will. Id. at 276. The fact that the parties did not itemize the inventory to be turned over was immaterial, particularly in light of the fact that the plaintiff was most interested in the defendant vacating the property before a certain date. Ibid. The court found ample evidence in the record to support the verdict, and found that the trial turned almost entirely on credibility issues. Satellite Entm't Ctr., Inc., supra, 347 N.J. Super. at 270.

In like manner, here there was sufficient evidence for the jury to conclude that Krill and Jonas agreed Krill would not sue IDT. Although the scope of the release was not specifically explained, IDT was certainly aware and the jury knew that Johnson

had sent a letter on June 26, 2008, referring to potential claims by Krill against IDT. The letter also mentioned IDT's failure to pay Krill a severance package similar to those paid to others when they separated from the company.

The testimony and the record established sufficient evidence of a mutual understanding regarding Krill's severance, including that he would not sue IDT if he were paid a settlement. And certainly, IDT could not deny that it paid Krill $250,000 per year for four years. The reasonable inference to be drawn from this testimony is that the agreement existed, and that it included Krill's forbearance.

IDT also argues the parties did not reach agreement over IDT's attempt to define the scope of the release, that they continued to negotiate the release term, and ultimately never agreed upon a final version of the document exchanged by Johnson and IDT. Defendant cites to an August 26, 2008 proposed written agreement from IDT to Krill which included release provisions that were outright rejected by Krill. That Johnson sent a draft agreement to Schwell that did not include a release provision is immaterial, assuming that the parties were bound by their earlier oral agreement, a finding the jury reached.

Johnson, in unqualified testimony, stated that Krill entered into an agreement, the essential terms of which were reached by

July 30, 2008, and that his subsequent discussions with Schwell and Greenstein were efforts to attempt to memorialize the agreement in writing.  Since Greenstein did not testify, that testimony stood unrefuted.  The jury resolved any question regarding whether an enforceable oral agreement existed as of July 30, 2008, in favor of Krill.

The jury knew that IDT paid Krill $1 million of the $2.5 million owed even though Johnson and Schwell were unable to convert the oral agreement into a signed, written contract.  Krill acknowledged that the lawyers would finalize the terms during his July 30 meeting with Jonas.  The jury, however, was free to credit other portions of Krill's testimony, in addition to Johnson's.  At the same time, the jury likely found Courter and Jonas not credible based on their testimony that was contradicted by evidence presented by Krill.  Courter's statement that the company enters into written agreements with executives was contradicted by both Krill and Jonas.  Jonas' testimony contradicted Johnson's and Krill's testimony on the subject of whether Jonas spoke with Johnson and confirmed to him the terms of the $2.5 million settlement.

Thus, when drawing all inferences in favor of plaintiff, there is sufficient evidence for the jury to have found that Krill and Jonas orally agreed on the terms of the release and were not

further negotiating those terms. Defendant was properly denied a new trial and JNOV.

## IV.

Defendant also contends that no contract was reached between the parties because they did not agree on the scope of Krill's employment, and IDT is entitled either to JNOV or a new trial. Jonas made clear through his deposition testimony that, as part of the agreement, Krill would be available "for any help we might need that he was in a position to provide." Jonas further acknowledged in his direct testimony at trial that it "was sort of understood that he would you know report personally to me, and if there was something you know that he had a special talent that he could do or something like I found for him, I — I would — I would have him do that, but there — there wasn't." Krill testified in a similar manner, that he would be "available for the company for the next four years, whatever they need from me." The jury was free to credit Krill's testimony and Jonas' testimony on this term, while discrediting Jonas' argument that he never reached an agreement with Krill. After all, Krill was paid $1 million by defendant over four years without a written agreement specifying what "being available" specifically meant.

Certainly "available for the company" is vague. But IDT did not present any complaints regarding Krill's failure to perform,

in fact, IDT continued to pay Krill the $250,000 per year for four years.  There was no dispute regarding the specificity of the term until this lawsuit was filed.  Accordingly, not only was there sufficient evidence for the jury to find for Krill, no miscarriage of justice occurred which warranted a new trial.

                                    V.

Lastly, IDT contends that it is entitled to a new trial because the evidence established that the parties did not intend to be bound by their July 30 meeting.  IDT further asserts that the parties only intended to continue to negotiate and enter into a written contract, and that if that final step was not taken, it was because of a material disagreement in terms.

As previously noted, parties may contract orally and be bound by such an oral agreement, so long as the parties seeking enforcement can demonstrate all essential terms were agreed upon, and that it was not understood that any obligation would arise only on the execution of a formal writing.  See Trs. of First Presbyterian Church in Newark, supra, 22 N.J. Super. at 502; see also McBarron, supra, 365 N.J. Super. at 117.

In McBarron, supra, 365 N.J. Super. at 115-16, we reversed the trial court's grant of summary judgment in favor of a seller who withdrew from an agreement, finding that an issue of material fact was raised concerning whether the seller intended to be bound

                                    23

by an oral contract of sale for real estate. In McBarron, the buyers, a husband and wife, brought an action to enforce an oral contract to purchase a lot on which they intended to build a home. Id. at 115, 118. The buyers claimed an oral agreement to purchase the property for $185,000 was formed during telephone conversations with Barry Jost, who was representing the seller-defendant. Id. at 118. The telephone conversations were the culmination of a long course of negotiations. Id. at 117. Jost called the husband and told him that the purchase price of the lot was $185,000, which the husband accepted. He then asked if the transaction was a "done deal," to which Jost replied, "definitely." Id. at 118. Jost told the husband that he and his wife were "like family" and that the seller's attorney would "draw up" an agreement. Ibid. Before the end of the telephone conversation, Jost assured him that "the deal was done." McBarron, supra, 365 N.J. Super. at 118. Four days later, Jost called the husband and advised him that a builder-friend had offered $190,000 for the lot, but did not attempt to renege, acknowledging that they "had a deal" and Jost would "honor it." Ibid. Jost added that he had explained to his friend that the husband and wife were the "contractual owners" of the property. Ibid. The husband tape-recorded the conversation, during which Jost repeatedly confirmed that they had a deal. Id. at 118-19. Jost later called

the husband "to renege on the agreement" because he had received a significantly higher offer by a corporate entity.  Id. at 118.  The buyers filed an action to enforce the agreement.  Id. at 115, 119.

We said that "the mere anticipation of a written memorialization of an oral agreement," provided that all the elements of a contract are present, "does not as a matter of law vitiate an oral contract."  McBarron, supra, 365 N.J. Super. at 116.  The buyers' proofs, if credited by a trier of fact, would support by clear and convincing evidence a finding that the parties had entered into an oral contract for the sale of the lot.  Id. at 119.

The controlling question in this litigation was whether Krill and Jonas entered into a binding oral contract on July 30, 2008, or whether they expected and intended not to be bound by the terms of their discussion unless and until a written agreement was drafted.  In fact, the jury was instructed that there must have been "a meeting of the minds" in order to bind the parties.  The jury weighed the evidence, and found for Krill on the issue.

As the judge acknowledged in rendering her decision both on the motions for directed verdict, JNOV, and a new trial, the jury reached its decision based on credibility.  It is apparent from their decision that the jurors believed Krill and his attorney

Johnson. Jonas' credibility may have been diminished in light of the email from Greenstein to Johnson confirming that IDT was responsible for a $1.5 million payment to Krill, in addition to the four $250,000 a year payments he would receive. These circumstances supported Krill and his attorney's testimony, and seriously undercut that of IDT's representatives.

Thus, no manifest injustice resulted from the jury's verdict. To the contrary, substantial evidence demonstrated that IDT intended to pay Krill $2.5 million and may have done so sooner, had it not been negatively impacted by the 2008 financial crisis. Accordingly, IDT has failed to meet the standard for a new trial, and the judge's decision was therefore proper.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5664-14T3